868 A.2d 1171 (2005)
376 N.J. Super. 63
STATE of New Jersey, Plaintiff-Respondent,
v.
Anthony MAHONEY, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 25, 2005.
Decided March 17, 2005.
*1174 Dennis M. Mahoney, Westfield, and John Morelli argued the cause for appellant *1175 (Dennis M. Mahoney, attorney; Mr. Mahoney on the brief).
Michael J. Williams, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Attorney General, attorney; Mr. Williams, of counsel and on the brief).
Before Judges KESTIN, LEFELT and FUENTES.
The opinion of the court was delivered by
FUENTES, J.A.D.
Defendant, Anthony Mahoney, was tried before a jury and convicted of third-degree theft by failure to make required disposition of property, N.J.S.A. 2C:20-9; third-degree misapplication of entrusted property, N.J.S.A. 2C:21-15; and two counts of third-degree forgery, N.J.S.A. 2C:21-1(a)(2). He was sentenced to an aggregate three-year term of probation, conditioned upon performing 500 hours of community service. The court also levied a $5,000 fine and ordered him to pay the mandatory statutory penalties. Defendant now appeals raising the following arguments:
POINT ONE
DENIAL OF PTI WAS A PATENT AND GROSS ABUSE OF DISCRETION AND A CLEAR ERROR OF JUDGMENT.
POINT TWO
THE VERDICTS BELOW WERE FACTUALLY INCONSISTENT.
POINT THREE
THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ITS RULINGS ON CHARACTER TESTIMONY.
POINT FOUR
THE TRIAL COURT ERRED IN REFUSING TO DISMISS COUNTS I AND II OF THE INDICTMENT.
A. Dismissal of 2C:20-9 For Failure to Present a Prima Facie Case
B. Dismissal of 2C:21-15 as Being Factually Duplicative of The Charge Under 2C:20-9 and Therefore a Denial of Due Process
POINT FIVE
THE TRIAL COURT'S EVIDENTIARY RULINGS, EITHER INDIVIDUALLY OR COLLECTIVELY, SO PREJUDICED THE DEFENSE AS TO CONSTITUTE A DENIAL OF DUE PROCESS AND EQUAL PROTECTION OF THE LAW.
A. Inadmissibility of Rule 1:21-6
B. Alleged Financial Condition As Proof of Motive
C. Admissibility of the Sworn Statements of Clark and Barbara Ferry
D. Medical Evidence  Letter from Dr. Dattoli to Judge Mahon
E. Trial Court's Abuse of Discretion in Rulings on Infidelity and Illegitimacy
F. Evidentiary Rulings Blocking Admissibility of Aggravated Sexual Assault Charge and Documentary Blood Alcohol Readings of C.J. Ferry
POINT VI
THE JUDGMENT ENTERED BELOW SHOULD BE REVERSED DUE TO PROSECUTORIAL MISCONDUCT.
A. Before The Grand Jury
B. Summation at Trial
POINT VII
THE FORGERY VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.
Defendant is an attorney.[1] The conviction for theft was based on defendant's *1176 delay in disbursing to his clients proceeds from a settlement of a wrongful death case. With respect to the forgery conviction, the State presented evidence that defendant endorsed and deposited the three-party settlement check without his clients' authorization.
The prosecutor denied defendant's application to enter Pre-Trial Intervention (PTI) and, on appeal from the prosecutor's denial, the trial court affirmed. The prosecutor premised his denial on the nature of the conduct allegedly engaged in by defendant. Relying on PTI Guideline 3(i), as codified in Rule 3:28, the prosecutor concluded that, as a licensed attorney, defendant was presumptively ineligible to participate in PTI because he was charged with committing crimes that involved a breach of the public trust. Accordingly, defendant had failed to overcome the presumption against admitting individuals charged with these type offenses.
After reviewing the record and in light of prevailing legal standards, we reverse the convictions. We conclude that the trial court improperly excluded substantial portions of proffered testimony by defendant's character witnesses. The court erroneously prevented these witnesses from testifying about defendant's character traits as an attorney, and improperly barred them from testifying about the specific experiences they had had with defendant that formed the basis for their opinions. We hold that defendant was entitled to present testimonial evidence attesting to his skill and care as an attorney in order to rebut the State's contention that his failure to timely disburse clients' funds constituted the criminal offense of failing to make required disposition of property.
The trial court also improperly submitted to the jury the full text of Rule 1:21-6. This Rule sets forth an attorney's bookkeeping responsibilities related to the practice of law, with respect to both the attorney's business records and to records of client funds entrusted to the lawyer for a particular purpose. The error here involved the court's failure to provide instructions to the jury on how to consider and apply the Rule's directives to the facts of this criminal case. Without judicial guidance, a criminal jury may mistakenly regard the Rule's requirement as an element of the criminal offense of failing to make the required disposition or misapplication of entrusted property.
We further conclude that certain statements made by the prosecutor during summation were so egregious that they deprived defendant of his right to a fair trial. These involved a hypothetical scenario entirely unrelated to the crimes for which defendant was charged, and suggested that it was unnecessary for the State to prove at which point defendant's conduct became criminal.
We affirm, however, the trial court's denial of defendant's PTI application. We hold that defendant failed to show that the prosecutor's rejection amounted to a gross abuse of discretion or was otherwise arbitrary or capricious.
In light of these determinations, we decline to consider the balance of defendant's arguments. Our factual recitation will thus be limited to the facts necessary to address the pertinent legal issues previously identified.

I
Defendant began practicing law in 1971. His first job as a lawyer was at the office of the Bronx District Attorney. He was admitted to the New Jersey bar in 1972. He and a partner opened a law firm in Cranford in 1974. Thereafter, he formed a partnership with his brother in Westfield, where he continued to work as of the time of trial. Defendant's practice primarily focused on litigation, but he also performed *1177 transactional work. He became a certified civil trial attorney when the program was inaugurated in New Jersey.
Barbara and Clark Ferry had been friends with defendant's secretary, Maureen Holohan, since childhood. The Ferrys first contacted defendant in the mid-1980s when they discovered that their six-year-old son, Richard, had been born with an eye problem. No lawsuit was filed in that case. In 1993, the Ferrys contacted defendant after their daughter, Desiree, died of injuries sustained in a one-car accident. After considerable discovery, that case was withdrawn several years later because defendant was unable to find a medical expert to opine that the hospital or any of the treating physicians were civilly liable for the child's death. In 1997, defendant successfully defended the Ferrys' son, Clark (known as "CJ"), when he was arrested on an indictable criminal charge. Defendant never charged the Ferrys for his services on these cases.
In February 1998, twenty-one-year-old CJ was killed by a car as he attempted to cross Route 9 in Monmouth County at 2:00 a.m., after drinking with friends at a nearby club. The following spring, the Ferrys received several telephone messages from the driver's insurance company, Harleysville Insurance. Mrs. Ferry asked defendant to contact the insurance company "and find out what they wanted."
According to the Ferrys, defendant contacted the insurance company and began to negotiate a settlement. The Ferrys discussed the progress of the settlement negotiations with defendant on the telephone on "more than one occasion" during the fall of 1998. Thereafter, defendant informed Mrs. Ferry that the insurance company wanted to settle the claim to avoid any future lawsuit.
In December 1998, defendant sent Mrs. Ferry a contingency fee retainer agreement. Several changes were made to the agreement as a result of telephone discussions she had with defendant. Mrs. Ferry alone signed the agreement as administratrix ad prosequendum of the estate of Clark Ferry. The agreement provided for defendant to receive, by way of compensation, thirty-three percent of any monetary settlement.
At defendant's request, the Ferrys met him on January 4, 1999, at the surrogate's office located at the Ocean County Courthouse. Both Mr. and Mrs. Ferry signed an application for administration ad prosequendum. Mrs. Ferry testified that she did not understand the purpose of the application. She also testified that she signed "a lot of papers" that day without knowing what she signed.
According to Mrs. Ferry, the first time she saw a document that the prosecutor called "a release" was during defendant's trial. She testified, however, that the signatures on the document belonged to her and her husband. On cross-examination, she was shown a release dated January 1999. She surmised that she must have signed the document during her visit to the surrogate's office on January 4, 1999. She also indicated that the signatures on a document dated January 7, 1999, which the prosecutor referred to as a "general release," were not the signatures of her or her husband. Although she never heard the term "refunding bond" and could not recall signing one, she identified her and her husband's signatures on a partial refunding bond sent to them by defendant on April 15, 1999. Mr. Ferry also identified his signature on the release, but was unable to recall signing the documents. He said defendant explained "some things" about the documents, but that he "didn't really attach any significance to them."
On or about January 12, 1999, the Ferrys received the following letter from claims representative Rachel Brown:

*1178 In accordance with N.J.A.C. 11:2-17.11, Unfair Claims Practices, we are required to notify you of settlement of your third party liability claim with your legal representative.
We are required by the above act to provide you with the following information.
1. The amount of payment: $75,000
2. The party/parties to whom the check was made payable: Clark Ferry & Barbara Ferry, as Administrators Ad Prosequedum [sic] for Estate of Clark Ferry, Jr. and Mahoney & Mahoney, as attorneys.
3. The party to whom the check was mailed; Mahoney & Mahoney.
4. The address of the party to whom the check was mailed: P.O. Box 309, Westfield, NJ 07090
Instead of reading the letter herself, Mrs. Ferry testified that she left it for her husband to read. She never discussed the letter with her husband until the following October. She admitted, however, that on or about January or February 1999, defendant told her that he had deposited the settlement check in his account, and that the State would not release the funds for thirty days.
Mr. Ferry testified that he read the letter in January 1999, and discussed it with his wife. He told her to call defendant because, although he "originally" did not understand the letter, "it became clear to [him] as [he] discussed it with [Mrs. Ferry] ... that it meant that there was a payment that was made." He also understood that the check had been deposited by defendant. Mrs. Ferry called defendant in March 1999, "to see if he had received the release from the State so that he could issue our portion of the check." Defendant told her he was still waiting for releases pertaining to "the New Jersey income tax."
In April 1999, Mr. Ferry was in the process of refinancing his mortgage. He called defendant to determine when the settlement funds would be released and whether he could use it to payoff his second mortgage. According to Mr. Ferry, defendant told him that it "would be a month to six weeks worth of time before the monies would be released." Three weeks before the expiration of his sixty-day mortgage commitment, Mr. Ferry again telephoned defendant's office inquiring about the availability of the settlement funds. He was told by the person who answered "that the monies had not been released yet." Mr. Ferry decided to cancel the refinancing.
In August 1999, Mr. Ferry again contacted defendant seeking information on the status of the settlement funds. According to Mr. Ferry, defendant told him that he was planning to file a motion, sometime in September, to have the settlement funds released because "no liens" had been found against his son. Defendant attributed the delay to unspecified matters related to CJ's estate.
In October 1999, Mrs. Ferry contacted an acquaintance who was on the staff of a State Senator, to obtain information on the New Jersey tax "that was holding up the settlement money." She gave this person a copy of the January 12, 1999 letter from the insurance company. Mrs. Ferry testified that, as a result, she discovered that the settlement check had been issued listing three people as payees.
When Mrs. Ferry obtained a copy of the front and back of the settlement check, she noticed that it contained the signatures of Clark B. Ferry, Barbara Ferry, and Mahoney and Mahoney, with the word "trust," and an account number. Both Mr. and Mrs. Ferry testified that these were not their signatures, and that they had not authorized anyone to endorse the check on *1179 their behalf. When Mrs. Ferry contacted defendant's office, she was told that the money had finally been released and that she should receive her share by the end of the month.
At this point, the Ferrys contacted the Westfield Police Department, which directed them to the Union County Prosecutor. On December 16, 1999, Mrs. Ferry called defendant from the Westfield Police Department. A recording of the call was played for the jury. In the conversation, defendant tells Mrs. Ferry that he "finally got an Order signed by [a judge] that came in late November that gives the State 30 days" and that at "[t]he end of this month they should have to pay it." He told her that "they should give me something in writing that says there's no tax and ... that's the final thing." He added that "[t]he Surrogate [was] waiting on the taxing authority to give them a tax clearance certificate" and that he "figure[d]" they should have it by "the end of the year." She should expect to hear from him "[p]robably [in] a couple weeks."
On December 21, 1999, the police executed a search of defendant's office and seized numerous documents including the Ferry file and bank records. Ten days later, Holohan delivered to the Ferrys a $50,000 check dated December 31, 1999, payable to Clark and Barbara Ferry for the estate of Clark Ferry. The check was drawn on the Mahoney and Mahoney Partnership Attorney Trust Account.

II
In addition to the Ferrys, the State called Susan Walters, chief clerk of the Ocean County Surrogate's Office to explain the legal function of her office to the jury. Walters explained that letters of administration ad prosequendum are required to obtain the right to file a wrongful death suit on behalf of a decedent. Here, these documents were issued on January 4, 1999, to Clark and Barbara Ferry.
According to Walters, the Ferrys needed judicial approval to dispose of any estate asset, "even in the form of a check." This procedure is only necessary, however, when the check is issued to "the estate of" decedent. Court approval is not required when, as here, the check is made payable directly to the heirs and their counsel.
Because the surrogate's office was never notified of any assets placed in CJ's estate, no inheritance tax would have been due from his parents. As to the need for bonding by the Ferrys, Walters explained that a partial refunding bond was only necessary when the heirs receive only part of their "benefits." In this scenario, a refunding bond protects the executor or administrator "if there's a just debt that comes about after [the heirs] receive their money."
The State also called Rachel Brown, the claims adjuster in charge of the Ferry matter. Brown received defendant's name from an investigator the carrier hired to locate CJ's family. She contacted defendant on August 4, 1998, and they exchanged correspondence throughout the fall. She characterized the case as "complex" because it involved a fatality and questionable liability by the insured. According to Brown, CJ may have been intoxicated, was wearing dark clothing, and had crossed the middle of Route 9 in the early hours of the morning.
On December 10, 1998, Brown offered defendant $50,000 to settle the case. On December 14, 1998, defendant made a demand for $75,000, which Brown agreed to on December 30, 1998. On that same day, she requested confirmation that the parents in fact were responsible for the estate. Defendant faxed her copies of the relevant documents on January 7, 1999.
*1180 That same day, Brown forward to defendant a copy of the release. The next day, January 8, 1999, the insurance company received a letter from defendant transmitting an executed release showing the Ferrys' signatures. The settlement check was issued immediately thereafter, and cashed on January 22, 1999.
Detective Gagliardi of the Union County Prosecutor's Office testified regarding the bank records seized from defendant's office. The Mahoney and Mahoney partnership attorney trust account was held at Fleet Bank (referred throughout the trial as "the 116 account" or "the trust account"). The partnership's business account bore a different account number. Bank records for the trust and business accounts covered a period from January to November 1999.
A series of banking transactions document how the critical events unfolded. It is necessary to list these transactions chronologically in order to fully appreciate the State's theory of culpability:
(1) On January 15, 1999, the 116 trust account had a balance of $250.19;
(2) On January 20, 1999, a deposit was made in the amount of $75,000;
(3) On January 21, 1999, a further deposit was made in the amount of $6,000;
(4) On January 21, 1999, three separate checks were written from this account: (i) a check for $17,045.08, payable to a bank; (ii) a check for $17,954.92, payable to a mortgage company; and (iii) a check for $15,000, payable to a mortgage corporation.
(5) On January 22, 1999, three more checks were written from the trust account: (i) a check for $6,000, payable to Mahoney and Mahoney law firm; (ii) a check for $18,827.08, payable to an individual; and (iii) a check for $4,517.92, payable to an individual.
(6) The account's ending balance for the month of January was $1,905.19.
Numerous checks were also written from the trust account to the firm's business account during the period from February to November 1999, as well as a $6,000 check issued to defendant. The partnership's business account had a beginning deficit balance in January 1999 of $596.79. After $17,492.74 was deposited into the account, the ending balance was $1,634.66. The bank sent five insufficient funds notices on the account in February, June and August 1999.
Defendant testified in his own defense. He claimed that Barbara Ferry knew that he received and deposited the settlement check, because she verbally authorized him to endorse it. He lied to the Ferrys as to the status of the settlement funds to deflect their inquiries, thereby enabling him to concentrate on his treatment for prostate cancer. Although the cancer was not diagnosed until March 1999, based on his ill-health, he underwent an aggressive pre-diagnosis treatment regimen contemporaneous to the receipt of the settlement check.
Defendant acknowledged that bank records, including those involving the trust account, were not maintained in proper accounting order. He attributed most of the problems to his poor health, commencing with a heart attack in 1997. His health and related emotional problems only worsened after the cancer was diagnosed. He had prostate surgery and follow-up radiation therapy. This rendered him temporarily incontinent, which, in turn, caused him to feel depressed and generally unconcerned with his business affairs. Defendant also called two expert witnesses, a cardiologist and a psychologist, who had treated him at various points in his illness. These witnesses corroborated defendant's testimony with respect to his inability to fully attend to his business affairs.
*1181 In rebuttal, the prosecutor emphasized defendant's ethical responsibilities to maintain attorney trust account records in conformance with the requirements of Rule 1:21-6. She aggressively cross-examined defendant on the details of his derelictions vis-a-vis the Rule's requirements, and highlighted his thirty years of practicing law without ever having maintained his trust account ledger in compliance with the Rule's requirements.

III
A central part of the defense focused on defendant's lack of intent to permanently deprive the Ferrys of the settlement proceeds. He emphasized that he never paid himself the one-third contingency fee he was entitled to receive under the retainer agreement. In furtherance of this defense, defendant called a group of eight individuals, consisting of both colleagues and former clients, to provide character evidence testimony concerning his manner of practice and reputation as a lawyer.
Prior to these witnesses testifying before the jury, defense counsel proffered that each witness would testify about the details of his or her relationship with defendant and offer opinions on defendant's honesty, trustworthiness, diligence and ability as an attorney. For each of the eight potential witnesses, defense counsel indicated when the individual had met defendant and the circumstances of the relationship. By way of example, one potential attorney-witness had known defendant since 1972, was a former co-worker, referred cases to him, and worked jointly with him on cases. Another had known defendant since law school, served with him in Vietnam, and handled cases with him.
After hearing defense counsel's proffers, the trial court determined that the evidence defendant sought to introduce fell within N.J.R.E. 404(a)(1), regarding a "pertinent trait of the accused's character," and not within N.J.R.E. 404(c), which involves "a character or trait [that] is an element of a claim or defense." The court thus ruled that the witnesses could only testify "as to their opinion of the defendant's reputation in the community as to honesty, trustworthiness, integrity and diligence." They were precluded, however:
from testifying as to whether or not they were satisfied with the defendant as an attorney, their opinion of him as an attorney; that they would still be hiring him as a lawyer today; that they referred other clients to him; that he's handled millions of dollars for particular clients through trust accounts.
The court excluded this area of potential testimony because, in its reading of the Rule, "those are not character traits, they are not pertinent, and they are specific instances of conduct and not opinion or reputation testimony."
The court thereafter conducted a series of N.J.R.E. 104 hearings in which the prospective character witnesses described, in great detail, their experiences with defendant. At the end of these hearings, the court ruled that each witness was restricted to testify only about general information concerning that witness's relationship with defendant.
Thus, the attorney who served in Vietnam with defendant was specifically precluded from mentioning that aspect of their relationship. The court directed defense counsel to use leading questions and "to tell your witnesses that they are not to blurt out anything about compassion, anything about quality of services, anything about anything other than their opinion regarding the trustworthiness, truthfulness and integrity" of defendant. Against this backdrop, we will now discuss the legal issues involved.
*1182 It is well settled that a defendant in a criminal trial has the right to present character evidence to address the principal question the jury must ultimately answer: has the State met its burden of proving guilt beyond a reasonable doubt. State v. Siciliano, 21 N.J. 249, 260-62, 121 A.2d 490 (1956); State in the Interest of V.M., 363 N.J.Super. 529, 537, 833 A.2d 692 (App.Div.2003); State v. Micci, 46 N.J.Super. 454, 459-60, 134 A.2d 805 (App.Div.1957); State v. Steensen, 35 N.J.Super. 103, 106, 113 A.2d 203 (App.Div.1955). Because the right to present character evidence is embedded in the presumption of innocence, N.J.R.E. 404(a)(1) prohibits a court from excluding character evidence, under N.J.R.E. 403, offered by the accused.
Here, the trial court erred when it precluded testimony about defendant's traits of care as an attorney. Under N.J.R.E. 404(a)(1), defendant was entitled to present testimonial evidence attesting to his professional relationship with other clients. Such evidence directly relates to the crucial issue in this case, to wit, whether defendant's failure to turnover the settlement funds in a timely fashion is indicative of a criminal intent to perpetrate a theft, or of mere negligence brought about by sloppy recordkeeping and poor health.
The court also erred when it excluded the testimony of witnesses' personal experiences with defendant that formed the basis for their opinions of his character. Without such a foundation, character testimony is reduced to a net opinion. In evaluating the value and legitimacy of the witnesses' opinion, the jury is entitled to consider the experiences that the witness and defendant have shared, and how they illuminate and reveal the content of a person's character.

IV
As previously noted, in the course of cross-examining defendant, the prosecutor made repeated references to the record-keeping requirements contained in Rule 1:21-6. Overruling defendant's objections, the court permitted the prosecutor to revisit this issue in her summation to the jury. The prosecutor also was permitted, over defendant's objections, to make the following remarks:
I would submit to you that the defense argument that [the Ferrys] got their money therefore, he didn't have any criminal intent and he didn't commit a theft, that is ridiculous. I'll give you a whole bunch of examples.
Somebody who is shoplifting at a store and gets caught by the security guard on the way out and then says well, I still have it inside my pocket. Here, you can have it back. So now I didn't commit shoplifting. Or somebody goes into a person's house and commits a burglary and takes an expensive piece of jewelry and [sic] witness sees who the person is and [sic] person gets away.
* * *
And then an arrest warrant is issued for that person and 11 months later the person is arrested, and then the person says oh, here's that watch. You can have it back now. I didn't commit the burglary. And there's no theft because I didn't have any intent. And, you know, if the person had asked me enough times for their watch back I would have given it to them.
Prosecutors are afforded considerable leeway in arguing the State's case to the jury "as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82, 727 A.2d 1 (1999). Prosecutors may suggest legitimate inferences *1183 that may be drawn from the record, but they exceed the bounds of fair comment if they go "beyond the facts before the jury." State v. Harris, 156 N.J. 122, 194, 716 A.2d 458 (1998), cert. denied, 532 U.S. 1057, 121 S.Ct. 2204, 149 L.Ed.2d 1034 (2001). Simply stated, prosecutors are not permitted to make inaccurate legal or factual assertions during summation. Frost, supra, 158 N.J. at 85, 727 A.2d 1; State v. Rodriguez, 365 N.J.Super. 38, 48, 837 A.2d 1137 (App.Div.2003), certif. denied, 180 N.J. 150, 849 A.2d 183 (2004). "They are duty-bound to confine their comments to facts revealed during the trial and reasonable inferences to be drawn from that evidence." Frost, supra, 158 N.J. at 85, 727 A.2d 1.
The comments at issue here were not an inaccurate statement of facts adduced at trial. Instead, the prosecutor used a series of hypothetical scenarios that she asserted were analogous to the facts of the case. The crime for which defendant was charged, however, bore no resemblance to the crime of shoplifting or burglary of a watch, where the crime is complete at a definite point in time. Because defendant did, at one point, disburse the funds to the Ferrys, there was a legitimate and critical threshold issue for the jury to decide; that is, whether an actual crime had been committed.
Moreover, at no point in the presentation of evidence or during summation did the prosecutor clarify for the jury the State's position as to when the crime was committed. Without legal guidance in this area, the jury was left on its own to determine when the theft crime was completed by defendant. Was it: (1) when defendant wrote $50,000 worth of checks from his trust account in January 1999; (2) when defendant told Mrs. Ferry that he needed to get a tax clearance certificate before he could release the funds; (3) when defendant represented to Mr. Ferry that the money would be available to payoff his second mortgage, thereby making the refinance of his existing mortgage possible; (4) when the Prosecutor's Office decided to investigate; or (5) at some other point entirely?
The State bears the burden of proving each and every element of a crime. State v. Ragland, 105 N.J. 189, 196, 519 A.2d 1361 (1986). By relying on factual scenarios completely unrelated to the crimes for which defendant was charged, the prosecutor's hypothetical scenarios improperly suggested to the jury that it was unnecessary for the State to prove at what point defendant's conduct became criminal.
Determining that a prosecutor's summation exceeded the bounds of fair comment on the evidence is insufficient, in and of itself, to warrant reversal. We must also determine whether these comments were so prejudicial that they deprived defendant of his constitutional right to a fair trial. State v. Michaels, 264 N.J.Super. 579, 636, 625 A.2d 489 (App.Div.1993), aff'd, 136 N.J. 299, 642 A.2d 1372 (1994). In making this determination, we must consider: (1) whether defense counsel interposed a timely objection to the remarks; (2) whether the remarks were withdrawn; and (3) whether the court ordered the remarks stricken and instructed the jury to ignore them. Frost, supra, 158 N.J. at 83, 727 A.2d 1; State v. Marshall, 123 N.J. 1, 153, 586 A.2d 85 (1991), cert. denied, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993).
Here, the prejudice caused by the prosecutor's remarks was left unchecked by the trial court. That is, by overruling defense counsel's timely objection, the court missed the opportunity to mitigate the harm by issuing a properly tailored instruction directing the jury to disregard the prosecutor's statements. Overruling defendant's objection also communicated to the jury the court's tacit endorsement of *1184 the prosecutor's incorrect expressions of the applicable law.

V
Defendant argues that his due process rights were violated by the trial court in three distinct rulings: (1) permitting the State to cross-examine him on whether he kept his trust account ledgers in accordance with the requirements of Rule 1:21-6; (2) permitting the prosecutor to refer to the Rule's requirements in the course of her summation; and (3) submitting the entire text of the Rule to the jury without the benefit of any judicial guidance as to its applicability to the facts and legal issues of this case. According to defendant, these rulings allowed the State "to mix and blur the line between civil and criminal concepts and prohibitions" and "create[] a double standard for a criminal violation of N.J.S.A. 2C:20-9."
We agree, in part, with defendant's arguments. The trial court correctly ruled that evidence showing defendant's failure to comply with the Rule's requirements was relevant to the jury's determination of guilt or innocence. The error here lies in the court's failure to limit the scope of the prosecutor's cross-examination of defendant. This error was compounded when the court permitted the jury to receive the entire text of this complex rule of accounting, without any instruction as to how it related to the issue of defendant's criminal intent.
Rule 1:21-6 is included in the New Jersey Court Rules Chapter III, pertaining to "Practice of Law and Admission To Practice." The Rule is entitled "Recordkeeping; Sharing of Fees; Examination of Records." R. 1:21-6. It has twenty-six sections and subparts, and is four pages long. Ibid. Judge Pressler's commentary on the Rule is another four-and-a-half pages. Pressler, Current N.J. Court Rules, comment on R. 1:21-6 (2005).
The Rule provides extensive, detailed requirements for the maintenance of attorney trust and business accounts. R. 1:21-6. The Rule: (1) establishes the accounts that must be kept by the attorney, R. 1:21-6(a)(1); (2) provides for the location of the accounts and delineates the terms of agreements between the attorney and the financial institution, R. 1:21-6(b); (3) describes the records that must be maintained by the attorney, R. 1:21-6(c); and (4) specifies the location of the records, R. 1:21-6(d).
The sole judicial instruction provided to the jury on the relevance and use of the Rule was as follows:
S-125 is a New Jersey court rule regarding records, keeping of attorney trust fund [sic] and what kind of records you have to keep and how you have to keep them. You also heard testimony about them. So if you wish during your deliberations to refer to that or read it, that will be in evidence also. And you'll have that in with your packet of exhibits.
Thereafter, during the charge on the elements of the crime of misapplication of entrusted property, the court advised the jury that: "Having insufficient funds in one's trust account to cover an attorney's obligations to his client is not in and of itself a criminal violation."
The jury received no further instructions on (1) the general application of the Rule; (2) which of its twenty-six subsections were applicable to the issues in this case; (3) how to consider the prosecutor's extensive cross-examination of defendant's failure to keep sufficient funds in his trust and business accounts; and (4) the significance of the Rule in determining the issue of defendant's intent.
An attorney's criminal conviction is clearly relevant to a determination of whether the attorney also has violated *1185 the ethical standards encompassed in the rules of professional responsibility. Matter of Pepe, 140 N.J. 561, 568-69, 659 A.2d 1379 (1995); Matter of Schaffer, 140 N.J. 148, 159, 657 A.2d 871 (1995). "Criminal conduct by an attorney is a particularly egregious form of unethical behavior." Matter of Pepe, supra, 140 N.J. at 568, 659 A.2d 1379.
The use of civil standards as an aid in determining criminal conduct, however, is more carefully restricted. In "limited and ancillary contexts," civil standards may be applicable to resolution of particular issues in criminal cases. State v. Damiano, 322 N.J.Super. 22, 50, 730 A.2d 376 (App.Div.1999), certif. denied, 163 N.J. 396, 749 A.2d 369 (2000). New Jersey courts largely have considered the issue in the context of the standards embodied in the Uniform Commercial Code (UCC).
UCC rules have been used to establish value in civil cases and may be employed to assist a jury in determining the amount of a theft. See State v. Burks, 188 N.J.Super. 55, 60, 455 A.2d 1148 (App.Div.), certif. denied, 93 N.J. 285, 460 A.2d 684 (1983); State v. Romero, 95 N.J.Super. 482, 487, 231 A.2d 830 (App.Div.1967). We have also utilized the UCC in employee embezzlement cases. State v. Lamb, 125 N.J.Super. 209, 215-216, 310 A.2d 102 (App.Div.1973). In Lamb, citing N.J.S.A. 12A:2-401(2), we deemed the crime of embezzlement to have been completed when defendant, the company's receiving clerk, signed a document acknowledging receipt of the goods. Ibid. We recognized that under the UCC, "title to goods passes to the buyer upon delivery, unless otherwise specifically agreed." Id. at 216, 310 A.2d 102. We have declined, however, to apply UCC notions of title to permit the State to seize a boat that had been used in a fraudulent insurance scheme from a bona fide, innocent purchaser for value. State v. Somerset Cent. Corp., 216 N.J.Super. 716, 718-21, 524 A.2d 893 (App.Div.1987).
In Damiano, supra, 322 N.J.Super. at 29-37, 730 A.2d 376, we disapproved of the manner in which a jury was instructed on UCC standards in a case involving allegations of theft by failure to make required disposition of property, misapplication of entrusted property, and theft by deception. The defendant in Damiano was an inexperienced and undercapitalized car dealer teetering on the brink of bankruptcy. Id. at 30-32, 730 A.2d 376. The evidence showed that he accepted payments and trade-ins for new cars but failed to payoff the liens on the trade-ins as he agreed to do. Id. at 32, 730 A.2d 376. He also resold traded-in cars to new customers without having paid off the prior liens, and failed to submit to the manufacturers customers' payments for warranties on their vehicles. Id. at 32-33, 730 A.2d 376.
The trial court instructed the jury in various aspects of the UCC and contract law. Id. at 39-41, 49, 730 A.2d 376. We held that the trial court failed to properly focus the jury's attention on the issue of intent, because it merely instructed the jury on the UCC standards without relating how the standards should be used in evaluating the facts relevant to the intent issue. Id. at 41-42, 730 A.2d 376. The violation of the stated UCC standards was not necessarily a criminal act. Id. at 40, 730 A.2d 376.
Speaking within the context of a business facing bankruptcy, we cautioned that, where criminal allegations arise from business dealings, accurate jury charges that relate the law to the facts are essential:
Insolvency resulting in the inability to pay creditors does not by itself necessarily imply that there was criminal conduct involved or that the unpaid creditors were the victims of criminal conduct. If that were so, every bankrupt would be *1186 liable to criminal prosecution. Obviously the harm caused to the creditors of an insolvent business is always the proper subject of civil litigation. The question is when and under what circumstances it may also fairly be the subject of criminal liability. We think it plain that in order for criminal liability to attach to the individual acts or the course of conduct engaged in by a businessman on the brink of insolvency, there must be criminal intent and criminal culpability as defined by the criminal statutes. Obviously, criminal liability cannot attach simply because civil liability attaches.
Our careful scrutiny of the jury charge here persuades us of its essential and overall failure properly to apprise the jury of these distinctions. In general terms, there was inappropriate intermingling between civil and criminal concepts. More significantly, while the instructions as to the crimes charged followed the model jury charges, the judge failed to mold those charges to include the facts of the case or to adapt them where necessary to those facts.
[Id. at 36, 730 A.2d 376.]
In circumstances more similar to those here, the California Court of Appeals held that it was reversible error to instruct a jury considering charges of embezzlement against an attorney on the state's Rules of Professional Conduct with respect to attorney trust accounts. People v. Stein, 94 Cal.App.3d 235, 156 Cal.Rptr. 299, 302-03 (1979). The defendant in Stein was charged with eighteen counts of grand theft by embezzlement, based on allegations that he "willfully and unlawfully took money entrusted to him by six separate clients such that [his] trust account had a deficit balance." Id. at 301. Stein wrote checks on the trust account to satisfy personal expenses when the balance was insufficient to meet the proven claims of clients. Ibid. His trust account had been overdrawn fourteen times in a two-year period; however, he maintained that he was unaware of the shortage until a later date, although he continued to write checks on the accounts once he knew. Ibid.
Stein denied that he ever "intentionally" took client trust money for his own uses. Id. at 302. Both sides presented expert witnesses on the accepted methods of handling client trust accounts, and the California State Bar Rules of Professional Conduct pertaining to trust accounts. Ibid. The jury was instructed that evidence presented "`tending to show that the defendant may have violated' the applicable rules . . . may be considered `only insofar as it may tend to prove that the defendant possessed the specific intent required. . . .'" Ibid.
The Court of Appeals held:
[I]t was improper to use the professional rules of conduct to show that a violation of the rules, if any, would tend to prove that defendant possessed the specific intent required when, in fact, the violation of the rules, if any, could have occurred without any criminal intent. Even though the instructions did not presume a violation of the rules, the only reasonable inference that the jury could have drawn was that evidence of a violation was in fact evidence establishing the required intent to commit the crimes charged.
[Ibid.]
The Stein court found that the evidence failed to meet the general test for relevancy of indirect evidence because evidence of a violation of the rules "does not tend logically, naturally and by reasonable inference to prove or disprove the state of mind (specific intent) of the crime charged." Ibid. The embezzlement charge required proof of "the intent unlawfully to deprive the owner of the property or `devote the same to his own use.'" Id. at 303 *1187 (quoting 21 Cal. Jur.3d (1975) Criminal Law, § 2258, p. 377; Perkins, Criminal Law, (2d ed.1969) pp. 292-93).
Turning our attention to the matter before us, the problem here was that the jury was provided with the text of a complex rule of professional accounting standards without any instructions on the relevance of the Rule to the issues before it. At no point was the jury instructed on which aspects of the Rule were relevant, to what issues, or how the Rule could assist the jury in reaching its decision. The court made no effort to assist the jury in distinguishing between the state of mind that established the violation of an ethical rule, and the level of criminal intent necessary to establish guilt with respect to a crime. The effect of the trial judge's one-sentence admonition was negligible in comparison to the prosecutor's extensive cross-examination and summation comments, which urged the jury to focus on the Rule's requirements and defendant's bookkeeping practices as indicative of his criminal behavior. We are thus compelled to reverse defendant's conviction.
We would be remiss, however, if we failed to give some guidance to the trial courts as to the proper use of the Rule in the context of a criminal trial. Rule 1:21-6 is, at its essence, a rule of accounting made particularly applicable to lawyers by virtue of the Supreme Court's plenary constitutional authority to regulate the practice of law. The Rule describes, in great detail, the recordkeeping requirements of both the lawyer's business accounts and trust accounts, where clients' funds are kept by the lawyer for a particular purpose.
With respect to trust accounts, the Supreme Court has stated:
Our prior cases clearly establish that shoddy bookkeeping alone does not suffice for a finding of knowing misappropriation. Although an attorney's records may reveal repeated and frequent instances of being out of trust, that circumstance does not necessarily constitute knowing misappropriation. Poor accounting procedures, however, "are no excuse for using client's funds. It is no defense for lawyers to design an accounting system that prevents them from knowing whether they are using clients' trust funds. Lawyers have a duty to assure that their accounting practices are sufficient to prevent misappropriation of trust funds."
[In Re Davis, 127 N.J. 118, 127, 603 A.2d 12 (1992) (internal citations omitted).]
In the context of a disciplinary case, however, an attorney's subjective intent is irrelevant. That is, once he makes improper use of client funds, it does not matter whether he intended to "borrow" or to permanently keep the funds. In Re Irizarry, 141 N.J. 189, 192, 661 A.2d 275 (1995).
Here, by contrast, the State must prove, beyond a reasonable doubt, that defendant engaged in "purposeful" conduct. In this context, shoddy recordkeeping, in violation of the Rule's requirements, may be invoked by defendant to negate the requisite mental state. Such a defense, however, can also be wielded as a sword by the State. It is entirely proper for the State to argue that this defense is purely pretextual, a clever attempt by defendant to conceal his true criminal purpose behind a facade of incompetence and outright defiance of his ethical obligations.
Confronted by these competing characterizations, it is the court's obligation to guide the jury in its search for the truth. Proper jury instructions in this area must begin by emphasizing that the State bears the burden of proving defendant guilty beyond a reasonable doubt as to each and every element of the crime. This burden *1188 is not diminished or transferred to defendant because he may have committed an ethical violation. The jury must be told that the accounting practices delineated in the Rule are relevant to determining defendant's state of mind, because they placed defendant on notice as to what was expected of him when he became the custodian of client funds. But, that is not the end of the jury's inquiry.
A violation of the Rule's requirements, in and of itself, is insufficient, as a matter of law, to sustain a finding of criminal culpability. However, together with any other evidence in the case, a jury may consider a violation of the Rule's requirements as evidence of defendant's purposeful conduct. The more egregious the violation, the greater its probative value is in assisting the jury in this determination. An extended pattern of conduct, displaying an utter disregard for the Rule's requirements, would have more probative value than an isolated incident of bad accounting.

VI
Defendant argues that denying him admission to the PTI program was a gross abuse of discretion and clear error of judgment, because the prosecutor failed to consider all the relevant facts and erroneously determined that defendant was presumptively ineligible under PTI Guideline 3(i)(4). Defendant contends that the prosecutor erroneously concluded that his status as an attorney meant that his crime involved a breach of public trust. He argues that the exclusion did not apply to him, because he was not a "public official" within the meaning of the PTI guidelines. We disagree. Given the facts of this case, the prosecutor's interpretation of Guideline 3(i)(4) was a proper exercise of his discretion.

A
On June 20, 2000, the Union County Prosecutor wrote to June Loughrey of the Union County Pre-Trial Intervention Program to object to defendant's admission to PTI: "This will confirm our telephone conversation that the above-referenced summonses charge Mr. Mahoney with two counts of third degree theft and two counts of third degree forgery. Notwithstanding same, this Office objects to Mr. Mahoney's admission into the Pre-Trial Intervention Program."
On August 8, 2000, defendant was sent a notice of rejection with an "Addendum/Update" from Marquita Sweet, a PTI team leader, which read as follows:
REJECTION: GUIDELINE 3(i)-4
YOUR OFFENSES, THEFT BY FAILURE TO MAKE REQUIRED DISPOSITION, MISAPPLICATION OF ENTRUSTED PROPERTY AND TWO COUNTS OF FORGERY WERE A BREACH OF PUBLIC TRUST, WHICH CONSTITUTES GROUNDS FOR REJECTION UNDER PTI GUIDELINES FOR OPERATION. IN DECEMBER 1998 YOU WERE HIRED TO REPRESENT THE VICTIMS IN A WRONGFUL DEATH LAWSUIT REGARDING THE DEATH OF THEIR SON AS A RESULT OF A MOTOR VEHICLE ACCIDENT. AS A LAWYER AND LONGTIME FRIEND OF THE VICTIMS YOU WERE ENTRUSTED TO BE THE FIDUCIARY OF FUNDS RECEIVED FROM THIS LAWSUIT. INSTEAD WHEN YOU RECEIVED THE SETTLEMENT CHECK FROM THE INSURANCE COMPANY ($75,000), YOU FORGED THEIR SIGNATURES AND DEPOSITED THE CHECK INTO YOUR ACCOUNT. YOU THEN WROTE THREE CHECKS, TOTALING $50,000, (THE *1189 VICTIM'S SHARE) AGAINST THE BALANCE TO PAY FOR UNAUTHORIZED EXPENSES. FOR APPROXIMATELY ONE YEAR YOU LIED TO THE VICTIMS, PROVIDING FALSE INFORMATION AS TO THE STATUS OF THE CHECK AND WHEN THEY WOULD RECEIVE THEIR SHARE OF THE MONEY. BANK ACCOUNT RECORDS REVEAL THAT YOUR BALANCE WAS INSUFFICIENT TO COVER THE AMOUNT OWED TO THE VICTIMS OVER THIS PERIOD OF TIME. THE VICTIMS DID NOT RECEIVE THEIR MONEY UNTIL 12-31-99 ALTHOUGH YOU DEPOSITED THE CHECK ON 1-20-99. YOU INDICATED THAT ALL THE MONIES HAVE BEEN PAID TO THE VICTIMS, HOWEVER, PTI NOTES THAT THIS DID NOT OCCUR UNTIL AN ACTIVE INVESTIGATION WAS COMMENCED BY THE PROSECUTOR'S OFFICE.
THE SERIOUS NATURE OF THE OFFENSE FAR OUTWEIGHS THE POSITIVE REHABILITATIVE FACTORS WHICH MIGHT BE PRESENT IN YOUR CASE. ACCEPTANCE INTO THE PTI PROGRAM WOULD DEPRECATE THE SERIOUS NATURE OF THE OFFENSE. YOU ARE A LAWYER WHO WAS ENTRUSTED TO REPRESENT YOUR CLIENTS' BEST INTERESTS, AND TOOK ADVANTAGE OF A 20 YEAR FRIENDSHIP, AS WELL AS YOUR POSITION AS THEIR LEGAL ADVISOR DURING A VERY TRAUMATIC AND STRESSFUL TIME. THE VICTIMS TOTALLY RELIED UPON YOU TO DIRECT THEM AND YOU EXPLOITED THE SITUATION AND CONTINUED THIS MOCKERY FOR OVER 10 MONTHS. YOU STOLE MONEY FROM YOUR FORMER CLIENTS AND USED "LEGAL" EXCUSES AS TO WHY YOU COULD NOT DISBURSE THE MONEY. THIS SUBSTANTIATES A BREACH OF PUBLIC TRUST OF THE OFFICE YOU WERE SWORN TO UPHOLD.
FURTHERMORE, YOU MINIMIZED YOUR INVOLVEMENT. YOU DID NOT ACT IN THE BEST INTEREST OF YOUR CLIENTS BY YOUR DEMONSTRATED BEHAVIOR. YOU LESSEN YOUR INVOLVEMENT BY CLAIMING THAT THE VICTIMS DID NOT CALL "TO DEMAND THEIR MONIES", BUT INSTEAD WOULD "OFTEN CALL TO INQUIRE ABOUT THE STATUS OF THE CASE". YOUR PROFESSIONAL EXPERTISE SHOULD HAVE ALERTED YOU THAT THE VICTIMS WERE INQUIRING ABOUT THEIR MONIES TO WHICH THEY WERE CLEARLY ENTITLED. THIS KIND OF PROFESSIONAL BRASHNESS CANNOT BE TOLERATED BY SOCIETY AND DISTINCTLY WARRANTS A REJECTION OF YOUR CASE.
Although not entirely clear from the record, it appears that the prosecutor adopted the August 8, 2000 letter from the PTI team leader. In rejecting defendant's challenge, the trial court accepted the prosecutor's position that defendant was presumptively excluded from PTI because he had been charged with offenses involving a breach of public trust.

B
Application for PTI is initially made to the criminal division manager who conducts an evaluation and makes a recommendation to the prosecutor. R. 3:28(h). In conducting their evaluations, the director and the prosecutor must consider the factors set forth in both N.J.S.A. 2C:43-12 and R. 3:28, Guideline 3. No *1190 crimes are per se excluded from enrollment in PTI. State v. Brooks, 175 N.J. 215, 224, 814 A.2d 1051 (2002). Any defendant charged with a crime is eligible. R. 3:28, Guideline 2. However, Guideline 3 provides:
[T]he nature of the offense is a factor to be considered in reviewing the application. If the crime was (1) part of organized criminal activity; or (2) part of a continuing criminal business or enterprise; or (3) deliberately committed with violence or threat of violence against another person; or (4) a breach of the public trust where admission to a PTI program would deprecate the seriousness of defendant's crime, the defendant's application should generally be rejected.

[R. 3:28, Guideline 3(i) (emphasis added).]
The public policy and statutory scheme of the Pre-Trial Intervention program is set forth at N.J.S.A. 2C:43-12 and  13, supplemented by guidelines adopted by the Supreme Court pursuant to N.J.S.A. 2C:43-14. The purpose of PTI is to augment the options afforded a prosecutor in disposing of criminal matters. Brooks, supra, 175 N.J. at 223, 814 A.2d 1051. A prosecutor's decision with respect to a PTI application is entitled to great deference. State v. Baynes, 148 N.J. 434, 443, 690 A.2d 594 (1997). In particular, a prosecutor's rejection of an applicant "will rarely be overturned" by a court. Brooks, supra, 175 N.J. at 225, 814 A.2d 1051.
A defendant seeking to overturn a prosecutor's rejection must establish "clearly and convincingly" that the prosecutor's decision amounted to a "patent and gross abuse of ... discretion." Baynes, supra, 148 N.J. at 444, 690 A.2d 594 (quoting State v. Wallace, 146 N.J. 576, 582, 684 A.2d 1355 (1996)). The standard is met if defendant can "show that the prosecutor's decision failed to consider all relevant factors, was based on irrelevant or inappropriate factors, or constituted a `clear error in judgment.'" State v. Nwobu, 139 N.J. 236, 247, 652 A.2d 1209 (1995).
The concept of a "clear error in judgment" is akin to the standard where the judicial conscience is "shocked" by the patently unreasonable application of guidelines to the particular facts of a case. Id. at 253-54, 652 A.2d 1209. The decision must be one that "could not have reasonably been made upon a weighing of the relevant factors." Id. at 254, 652 A.2d 1209 (quoting State v. Roth, 95 N.J. 334, 366, 471 A.2d 370 (1984)).
Because the issue of whether a prosecutor has exercised his or her discretion based on inappropriate factors is a question of law, Nwobu, supra, 139 N.J. at 247, 652 A.2d 1209, upon a finding of clear prosecutorial error, a court may order that defendant be directly admitted into PTI. State v. DeMarco, 107 N.J. 562, 567, 527 A.2d 417 (1987). In addition, "if a reviewing court finds that a prosecutor's decision was arbitrary, irrational, or otherwise an abuse of discretion, although not a patent and gross abuse, and if the court is satisfied that the remand will serve a useful purpose, it may send the case back to the prosecutor." State v. Kern, 325 N.J.Super. 435, 439-40, 739 A.2d 969 (App.Div.1999).
However, a reviewing court must avoid substituting its judgment for that of the prosecutor. Nwobu, supra, 139 N.J. at 254, 652 A.2d 1209. Moreover, a trial court proceeding on a PTI application "should not constitute a trial de novo on the applicant's admissibility, but should be confined to a review of the prosecutor's actions." State v. Leonardis, 73 N.J. 360, 383, 375 A.2d 607 (1977).

*1191 C
Here, defendant is charged with crimes that involved an abuse of his authority to establish and maintain his trust account for the exclusive purpose of safeguarding client funds. That authority flows directly from the constitutional power of the Supreme Court to grant to the lawyer a license to practice law. A lawyer assumes this custodial role as an incident of his or her status as an officer of the court. In this capacity, a lawyer's interactions with the public carry the imprimatur of the court, and the public's faith and confidence in the lawyer's integrity is inextricably linked to and derived from this official relationship.
Chief Justice Wilentz eloquently explained the historical basis for the public's view of the lawyer as holding a position of special trust:
Having sought his advice and relying on his expertise, the client entrusts the lawyer with the transaction  including the handling of the client's funds. Whether it be a real estate closing, the establishment of a trust, the purchase of a business, the investment of funds, the receipt of proceeds of litigation, or any one of a multitude of other situations, it is commonplace that the work of lawyers involves possession of their clients' funds. That possession is sometimes expedient, occasionally simply customary, but usually essential. Whatever the need may be for the lawyer's handling of clients' money, the client permits it because he trusts the lawyer.
It is a trust built on centuries of honesty and faithfulness. Sometimes it is reinforced by personal knowledge of a particular lawyer's integrity or a firm's reputation. The underlying faith, however, is in the legal profession, the bar as an institution. No other explanation can account for clients' customary willingness to entrust their funds to relative strangers simply because they are lawyers.
[In re Wilson, 81 N.J. 451, 454-55, 409 A.2d 1153 (1979).]
We find further support for the prosecutor's position in State v. Bender, 80 N.J. 84, 402 A.2d 217 (1979). The facts in Bender involved a pharmacist who became addicted to cocaine. He diverted quantities of drugs from the stock of the pharmacy where he was employed to maintain his supply of the illicit drug. Id. at 90, 402 A.2d 217. The prosecutor in that case applied Guideline 3(i)(4) to reject defendant's PTI application, concluding that Bender held a position of public trust by virtue of being a licensed pharmacist.
In reversing the prosecutor's decision, the Court made the following comments:
We also cannot accept the State's contention that defendant's crime constituted "a breach of the public trust." Guideline 3(i)(4). It is true that in issuing a license, the State entrusts a pharmacist with the dispensing of controlled dangerous substances in order that the health and welfare of the public not be undermined through indiscriminate and unsupervised consumption of drugs. See N.J.S.A. 24:21-1 et seq. Whether this "entrusting" is sufficient to make a pharmacist not employed by the State a "public trustee" under Guideline 3(i)(4) is a difficult question which we need not here address. For even assuming that a pharmacist can be so characterized, the crimes here charged would not constitute a breach of that trust.

Defendant's cocaine diversions were not intended to nor did they cause injury to the public in general or to any particular segment thereof. The cocaine was personally consumed, not distributed to third parties. Only defendant, himself, and his immediate employer were victimized. Thus, although defendant's crimes were made *1192 possible by his status as a licensed pharmacist, those crimes did not breach the trust reposed in him to protect the citizenry at large.

[Id. at 96, 402 A.2d 217 (emphasis added).]
By contrast, defendant's crimes here directly involved use of his authority as a lawyer to cause harm to his clients. He took advantage of "the trust reposed in him" to misappropriate his clients' funds.
We thus conclude our discussion of this issue by emphasizing that, although defendant's status as a lawyer does not operate as a per se impediment for consideration for enrollment into PTI, we are satisfied that the trial court correctly determined that defendant failed to show, by clear and convincing evidence, that the prosecutor's application of the presumption of ineligibility articulated in Guideline 3(i)(4) constituted a patent abuse of discretion.

VII
Defendant's conviction is reversed based on the trial court's improper limitation of character witness testimony, inadequate jury instructions on the use of Rule 1:21-6, and the prosecutor's inappropriate remarks during summation. The matter is remanded for a new trial.
NOTES
[1] Defendant was temporarily suspended from the practice of law on March 16, 2000. The record does not indicate whether the suspension remains in effect.