STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
ANTHONY SICILIANO, DEFENDANT-RESPONDENT.

Argued March 5, 1956—Decided March 26, 1956.

*Mr. George A. Gray*, Deputy Attorney-General, argued the cause for the State (*Mr. Vincent P. Keuper*, Monmouth County Prosecutor, attorney).

*Mr. William J. O'Hagan* argued the cause for respondent (*Messrs. Stout & O'Hagan,* attorneys).

The opinion of the court was delivered by

WACHENFELD, J. The interpretation of our criminal abortion statute, *N. J. S.* 2A:87-1, is one of the principal problems encountered in this appeal, although numerous other errors in the proceedings below are urged.

*N. J. S.* 2A:87-1 provides:

"Any person who, maliciously or without lawful justification, with intent to cause or procure the miscarriage of a pregnant woman, administers or prescribes or advises or directs her to take or swallow any poison, drug, medicine or noxious thing, or uses any instrument or means whatever, is guilty of a high misdemeanor.

"If as a consequence the woman or child shall die, the offender shall be punished by a fine of not more than $5,000, or by imprisonment for not more than 15 years, or both."

The defendant was indicted by a Monmouth County grand jury in two counts for a violation of the above statute. The first count charged the defendant unlawfully did use upon a pregnant woman, Jane Harrison, with intent to cause and procure a miscarriage, "divers instruments and means unknown," as a consequence of which the said Jane Harrison died. The second count charged the defendant "unlawfully did advise and direct the said Jane Harrison to take divers drugs and medicines," as a consequence of which she died.

Prior to the trial the defendant demanded, and the State was required by an order of the court to furnish, a bill of particulars. In answer to the questions, in what manner and by what means the abortion charged in the first count was allegedly performed, the State replied: "By use of an instrument or instruments, the names of which are presently unknown to the State." The State was also directed to answer the questions, in what manner and by what means the abortion charged in the second count was allegedly performed. In response to those questions, the State referred the defendant to the answers to the first set of questions.

It would thus appear the State abandoned the second count of the indictment which charged the use of drugs or

medicines inasmuch as its bill of particulars, in answer to both counts, specified the use of instruments.

At the trial, the main witness for the State was Henry Neuwirth, who acknowledged he had had relations with Jane Harrison as a result of which she became pregnant. He testified that on February 14, 1954, at approximately 2:30 P. M., he and Jane met the defendant in front of the Blue Jay Diner in Eatontown. He did not know the defendant prior to that meeting, but he and Jane were supposed to meet a man in a yellow Buick convertible. The defendant appeared in such a car and Neuwirth and Jane got out of their car and entered the convertible. Jane said: "Tony?" and the defendant answered: "Do you have the money?" Jane and Neuwirth each gave Siciliano $150 and then the defendant told Neuwirth he would meet him at the Blue Jay Diner at 6 o'clock. Jane drove off with the defendant in the direction of Shrewsbury Township.

Another witness testified he had observed the defendant's yellow Buick convertible parked in front of the home of a Mrs. Appleby sometime after 2 in the afternoon of February 14 and that the automobile was still there at approximately 5:30 P. M.

Shortly after 6 P. M. the defendant returned in the convertible to the Blue Jay Diner with Jane; Neuwirth was waiting for them, and Jane was helped into his car. She was not feeling well and the defendant remarked she should get some rest. Neuwirth told the defendant he would be staying at a particular motel and that his car would be parked in front of the door. The defendant left and Neuwirth took the girl to the motel. She was quite ill and seemed in pain.

Neuwirth testified that on the following morning the defendant came to the motel and gave Jane some pills and told her she would feel better "as soon as you pass this clot." Nevertheless, Jane's illness continued and that evening the defendant returned and offered to give her an injection but she would not submit to it. He gave her more pills and said everything would be all right.

The girl's condition continued to grow worse and on Tuesday night Neuwirth took her to a local hospital. He called the defendant on the phone and told him he was broke and would need cash for the hospital and asked the defendant to give him $100. The defendant met him at a drug store and gave Neuwirth the $100.

When the Harrison girl was admitted to the Hazard Hospital in Long Branch, she was examined by Dr. Kelemen. He found abdominal pain and some vaginal bleeding. He catheterized the bladder and removed some urine which she was unable to pass. On the morning of February 18 he performed an operation upon her consisting of a dilatation and curetage. He made an instrumental entry into the uterus and scraped out its contents, sending them to a laboratory. He continued to treat her until she was transferred to Mt. Sinai Hospital in New York, where she died on February 24.

On cross-examination, defense counsel elicited that upon the doctor's original examination of the Harrison girl he had made an entry upon her medical record that "patient has a severe oliguria possibly due to self-induced drugs?" He further testified that when the girl was admitted, both she and Neuwirth, who were posing as husband and wife, denied any criminal abortion. The doctor also testified that when he performed the operation upon her, he examined the cervix very carefully and found no marks of any kind upon it, but admitted there were marks after he had finished his operation. Counsel for the defense asked him whether or not the introduction of an instrument into the cervix would leave marks, to which the doctor replied: "No, not necessarily, no." He acknowledged, however, that despite all the care which he had used in his operation he had left marks upon the cervix.

He also testified on cross-examination that some of the contents he had removed from the uterus consisted of very dark tissue peculiarly stained and discolored. He said his opinion at the time was that it was a discoloration such as might or would have been made by a drug.

A Dr. Goldberg, a pathologist, testified he had examined the tissues removed from the uterus of the Harrison girl by Dr. Kelemen. The examination of these tissues revealed the patient had been pregnant and that an incomplete abortion had occurred.

Dr. DiMaio, who performed the post-mortem upon the girl, testified she had died of a post-abortive septic endometritis.

Other than the testimony elicited from Dr. Keleman on cross-examination conjecturing about the possibility of the use of drugs, no testimony was offered as to the means or manner in which the abortion had been accomplished.

Police officers testified for the State that when the defendant was confronted by Neuwirth in the Eatontown Jail on February 17 and identified as the man who had performed the abortion, he remained silent; and he likewise remained silent when he was brought into the hospital room of the Harrison girl and she identified him as the man who had performed the abortion.

At the end of the State's case, the defendant moved for a dismissal of both counts of the indictment. As to the first count, the defendant urged there was absolutely no proof an abortion had been attempted by the use of an instrument. As to the second count, he contended it had been abandoned by virtue of the bill of particulars and that the State was precluded from offering any proof in support of it relating to drugs and medicines.

The court reflected there was no testimony by any witness that an abortion had been attempted by an instrument, to which the State agreed, whereupon the State asked for leave to amend its bill of particulars so as to provide in answer to the questions noted earlier that the means used to accomplish the abortion were unknown to the State. The prosecutor in said motion acknowledged he had not "endeavored to show the means because that knowledge has not been within the State's knowledge."

The court, after much argument, granted the State's motion to amend the bill of particulars, whereupon the

defendant moved for a mistrial, claiming surprise. The defendant's thesis was that he had prepared his case entirely on the basis that the State would attempt to prove an abortion by means of an instrument and that he was unable to proceed with his case in its present posture. The trial judge granted a two days' adjournment to permit the defendant's counsel to survive the surprise and denied the motion for a mistrial.

The defense consisted entirely of an alibi. The defendant claimed he did not know Neuwirth or the Harrison girl and that he had been elsewhere on February 14. He produced alibi witnesses who testified as to his whereabouts on the afternoon of February 14 which, if true, would have precluded his being with the Harrison girl on the day in question.

There were other witnesses who testified that his yellow Buick convertible was not parked in front of the the Appleby house on that afternoon, and finally there were character witnesses who testified as to the defendant's good reputation.

At the conclusion of the testimony, the defendant moved for a judgment of acquittal on both counts. The motion was granted as to the second count dealing with the use of drugs or medicines but denied as to the first count.

In submitting the case to the jury, the trial court instructed them that the statutory offense for which the defendant was indicted consisted of three elements:

"The[s]e are pregnancy, intent to produce a miscarriage and resort to means forbidden by the statute."

As to the last-mentioned element, he charged them:

"[T]here is no evidence that the miscarriage of Jane Harrison, if you find that there was a miscarriage, was caused by any instruments and therefore the State is limited to the words, 'means whatever' in the statute."

The jury returned a verdict of guilty and the defendant was sentenced to a term of 10 to 15 years.

On appeal, the Appellate Division reversed the judgment of conviction, holding, in substance, that the trial court erred in leaving the jury free to find an unspecified and unknown "other means" was used to perform the abortion; that the offense under the statute was not the abortion itself but the use of an instrument, drugs or some other means to induce an abortion; and while the State may in an indictment charge the abortion was induced by means then unknown, at the trial it must offer some evidence as to what means were used and that it could not lawfully rely upon some "unknown means." *State v. Siciliano,* 36 *N. J. Super.* 334 (*App. Div.* 1955).

We acquiesce in the Appellate Division's expression when it said:

"We are not intending to suggest that there is any device, method or artifice, the unlawful use of which in, on, or in connection with a pregnant woman, with intent to cause or procure her miscarriage, is beyond the penalty of *N. J. S.* 2A:87–1. On the contrary, we deem it all-embracive. The words, 'or means whatever,' are clearly intended as an omnibus gathering together of every object or method for the illegal purpose not comprehended within the references to drugs, medicines, etc., or any instrument."

However, we are not in accord with the ultimate conclusion reached below. We think the State is not to be thwarted where admittedly there was a pregnancy and an abortion but the proof of the means used to bring it about is either difficult or lacking. The blueprint on which the statute was constructed contains no escape hatch. In fact, the legislative intent was quite to the contrary.

At common law, the essential element of the offense was the destruction of an unborn child, 1 *Wharton's Criminal Law* (12th ed. 1932), § 783, and there was no abortion unless the child was "quick." *State v. Cooper,* 22 *N. J. L.* 52 (*Sup. Ct.* 1849); *In re Vince,* 2 *N. J.* 443, 449 (1949). The abortion statute, now *N. J. S.* 2A:87–1, was enacted to alter this rule and make abortion a crime even though performed before the fetus had "quickened," *State v. Mur-*

*phy*, 27 *N. J. L.* 112 (*Sup. Ct.* 1858), the object being, according to *State v. Murphy, supra*, 27 *N. J. L.*, at *page* 114, not only the protection of the unborn child, but to protect the life and health of the mother as well. See also *State v. Loomis*, 89 *N. J. L.* 8, 9 (*Sup. Ct.* 1916), affirmed 90 *N. J. L.* 216 (*E. & A.* 1917).

Some means for bringing about an abortion may be more precarious than others, but causing an abortion by an unknown means is not less unlawful or less likely to produce the consequences which the Legislature sought to prevent because the specific means utilized is not susceptible of direct proof.

Here, admittedly the State failed to prove the means by which the abortion was accomplished. However, we do have proof of the defendant's going off with a pregnant girl for approximately three hours after she and her boyfriend had paid him $300; the defendant's return of the girl to her boyfriend in a sick state, barely able to walk and suffering from severe abdominal pains; the visit of the defendant to the girl after her condition did not improve and his assurance that she would be better when she passed her "clot"; the payment by the defendant of $100 to the boyfriend when the girl was taken to the hospital because of her abdominal condition; and, finally, the defendant's silence in the presence of the girl's identification of him as "the man that did the abortion" on her.

We do not think the statute imposes an obligation upon the State to go further and to prove the specific unlawful means which the defendant used to abort the girl. Where, as here, the evidence conclusively establishes the performance of an abortion by some means and there is proof beyond a reasonable doubt as to the identity of the person who performed it, the jury is warranted in concluding the abortion was committed by resort to a means forbidden by the statute, which, as we have noted, includes any "means whatever." In other words, under the abortion statute the State may substitute circumstantial evidence for direct proof of one of the elements of the crime, as in any other case. As Chief

Justice Case noted in *State v. Boyd*, 137 *N. J. L.* 23, 26 (*Sup. Ct.* 1948), affirmed 137 *N. J. L.* 615 (*E. & A.* 1948):

"When death ensues from an abortion there frequently is no means of establishing the ultimate fact of guilt except by resort to proof of circumstances."

█ So long as the evidence is of sufficient quality to generate in the minds of the jurors a belief and conviction of guilt beyond a reasonable doubt, it matters not whether direct evidence of guilt is present. *State v. Rogers*, 19 *N. J.* 218, 234 (1955); *State v. Boyd, supra*, 137 *N. J. L.*, at *pages 25–26.*

While research has failed to disclose any other adjudication in this State squarely supporting the views advanced herein, we are satisfied that the language of our statute is susceptible of no other interpretation. And this conclusion is confirmed by results in other jurisdictions. Thus, in *People v. Gomez*, 41 *Cal. App. 2d* 249, 106 *P. 2d* 214, 215 (*D. Ct. App.* 1940), the defendant was indicted for "using and employing an instrument or other means upon the person * * *." The applicable statute proscribed "using or employing any instrument or other means whatever with intent thereby to procure the miscarriage * * *." The evidence showed that a certain woman went to the defendant in order to procure an abortion; that the woman left to get the money which the defendant asked; that she told a friend what she was going to do, and that she returned to the defendant and thereafter disappeared. The woman's body was later found on a railroad track run over by a train. An autopsy showed she had died as the result of an abortion before her body had been put on the track. The doctors were unable to determine how the abortion had been caused. The court affirmed the conviction holding:

"The prosecution was not compelled to prove that an instrument had been actually used by appellant but it was sufficient to establish that some means was used by her to procure the miscarriage."

█ We cannot agree with nor are we persuaded, as was the court below, by the pronouncement in *Commonwealth v.*

*Lawton*, 14 *Dauph*. 186 (*Pa. Q. S*. 1910), holding the count in the indictment charging that the means were unknown to the grand inquest was good, but "when it came to the trial it was incumbent on the Commonwealth to show to the jury what the means were." There the court's analysis of the evidence indicated doubt whether the abortion was the result of an "unlawful act" or an "accident." No such doubt exists in the case *sub judice*. It was frankly and freely admitted on oral argument, and the record establishes, that there was pregnancy and an unlawful abortion, but it was contended the defendant was entirely detached from it. However, there is abundant evidence in the record to the contrary, and the identity of the perpetrator of the act was clearly a question for the jury to decide.

There were, however, other errors at the trial level justifying a reversal of the judgment of conviction which were not considered by the Appellate Division. Inasmuch as the defendant is merely seeking to maintain the judgment below, he may, of course, brief and argue on this appeal any additional matters which will support that judgment, despite the fact that no cross-petition for certification was filed. *State v. LeFante*, 14 *N. J*. 584 (1954).

In charging the jury upon the weight to be accorded evidence as to the defendant's good character, the trial judge said:

"This testimony is offered for the purpose of raising reasonable doubt of the accused's guilt. *In a doubtful case* good character may be sufficient to create a reasonable doubt in your mind, but if in fact he is proven guilty, his previous good character can avail him nothing." (Italics supplied.)

This instruction was erroneous. In effect, the court told the jury it need not consider the evidence as to good character unless the other evidence in the case raised a "doubt" as to the defendant's guilt, but that if they had no doubt, then the character evidence was not entitled to any consideration.

The rule has always been otherwise in this State. Evidence of good character may be sufficient in itself to

raise a doubt as to the guilt of the defendant, and it must be considered along with all the other evidence in the case and not restricted to situations where the other evidence itself raises a doubt.

In *Baker v. State*, 53 *N. J. L.* 45 (*Sup. Ct.* 1890), the trial court had charged:

"There is some evidence as to the defendant's good character for peace and quietness. In a doubtful case, evidence of character for peace and quietness is to be taken the same as any other evidence by the jury, and weighed with the other evidence; but, if there is no doubt, evidence of good character does not amount to anything." (53 *N. J. L.*, at *page* 47)

In reversing the judgment of conviction, the court said (*Ibid.*):

"Such a charge is erroneous. It is the right of a person charged with crime to have all the relevant testimony, including that relating to his good character or reputation, considered by the jury in every case; and if on such consideration there exists reasonable doubt of his guilt, even though that doubt be engendered merely by his previous good repute, he is entitled to an acquittal."

The rule pronounced in *Baker v. State, supra*, was affirmed by the Court of Errors and Appeals in *State v. Lang*, 87 *N. J. L.* 508 (*E. & A.* 1915). There, in commenting upon a similar type of charge as to character evidence, the court said:

"Therefore it clearly appears that the general observation made by the judge that the jury were to take all the testimony in the case, and upon that say whether or not the defendant was guilty—permitting them, only after considering all the other testimony, to take into consideration the question of reasonable doubt—they were, in reality, instructed not to take into consideration, nor to give to the defendant the benefit of, a reasonable doubt which might exist by reason of his good character, unless, upon the consideration of all the other testimony (excluding the character testimony), they felt undecided as to what they ought to do. This as shown is contrary to the rule in *Baker v. State, supra*, wherein it was held that it is the right of a defendant to have all the relevant testimony, *including that relating to his good character or reputation*, considered by the jury; and, if there be a reasonable doubt of guilt,

even if engendered by previous good repute, he is entitled to be acquitted. Plainly the defendant was entitled to have the evidence concerning his character considered at the same time and along with the other testimony." (87 *N. J. L.*, at *pages* 513–514)

And in *State v. Randall*, 95 *N. J. L.* 452 (*E. & A.* 1921), the rule was set forth in very similar language:

"The jury should consider all of the relevant testimony, including that relating to the defendant's good character or reputation, and if, on such consideration, there exists a reasonable doubt of his guilt, even though that doubt be engendered merely by his previous good repute, he is entitled to an acquittal; but if, from the entire evidence, including that relating to good character, the jury believe the defendant guilty beyond reasonable doubt, he should be convicted and the evidence of good character should not alter the verdict."

See *State v. D'Ippolito*, 19 *N. J.* 540, 548 (1955).

The defendant also contends that certain statements made by the prosecutor in his summation to the jury were so inflammatory in nature as to constitute prejudicial error, and the mere fact that the jury was instructed to disregard them could not possibly, under the circumstances, have erased either the remarks or their influence from the minds of the jury.

The objectionable phrase was: "There is the butcher boy who killed Jane Harrison and the baby." The State in its reply brief does not seek to justify the calling of the defendant "butcher boy" but deems the error to have been cured by the court's directing the jury to disregard the statement made by the prosecutor.

We think the remark so made was prejudicial error and should not have been uttered by the prosecutor. A prosecutor may be zealous in enforcing the law but he must nevertheless refrain from any conduct lacking in the essentials of fair play, and where his conduct has crossed the line and resulted in foul play, the reversal of the judgment below will be ordered. *State v. D'Ippolito, supra*, 19 *N. J.*, at *page* 550.

We have in many cases pointed to transgressions of a similar kind where the prosecutor has gone beyond the

bounds of propriety in his apparent conception of his obligations and duties. *State v. Orecchio,* 16 *N. J.* 125, 140 (1954); *State v. Bogen,* 13 *N. J.* 137, 139 (1953); *State v. Ferrell,* 29 *N. J. Super.* 183 *(App. Div.* 1954).

The responsibilities of a prosecutor and the Canons of Professional Ethics governing his course of conduct are fully set forth in *State v. D'Ippolito, supra,* and we are merely reaffirming what we have intimated heretofore, that where the transgression warrants us in concluding prejudicial error was committed, we will not hesitate to reverse. There was no justification for the prosecutor's complained-of remarks in the summation.

As to the alleged error in permitting an amendment of the bill of particulars at the close of the State's case, the main contention of the defendant is surprise, prohibiting him from properly presenting his case because his preparation for the trial had not included any consideration of an abortion performed by any other means than by an instrument. However, *R. R.* 3:4-6 specifically provides that a bill of particulars may be amended at any time, subject to "such conditions as justice requires." We see no error in the amendment having been permitted under the circumstances present here.

The defendant was granted a recess to overcome any surprise which may have been created and to permit the proper presentation of his defense. In any event, the disadvantage caused by the surprise which the defendant claims he suffered at the trial below will not again be encountered when the case is retried.

There are other matters set forth by the defendant, but they do not contain sufficient substance to require specific disposition here.

The judgment of the Appellate Division reversing the conviction will be affirmed, not upon the grounds stated by the Appellate Division but for the reasons herein set forth. The cause is remanded for retrial in compliance with the views here expressed.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.