908 A.2d 162

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. ANTHONY M. MAHONEY, DEFENDANT–
RESPONDENT.

Argued January 31, 2006—Decided April 19, 2006.
Refiled May 30, 2006.

360

*Michael J. Williams,* Deputy Attorney General, argued the cause for appellant (*Zulima V. Farber,* Attorney General of New Jersey, attorney).

*Dennis M. Mahoney* argued the cause for respondent (*Mr. Mahoney* and *John Morelli,* attorneys; *Mr. Mahoney* and *Mr. Morelli,* on the briefs).

*Jeffrey S. Mandel* argued the cause for amicus curiae, Association of Criminal Defense Lawyers of New Jersey (*Pitney Hardin,* attorneys).

Justice RIVERA–SOTO delivered the opinion of the Court.

Defendant Anthony Mahoney, a practicing attorney at law in this State, was convicted by a jury of stealing client funds entrusted to him. The jury determined that defendant committed a series of crimes by delaying the disbursement of funds owed to his clients, and by forging endorsements on a settlement check and depositing it without authorization. On defendant's appeal, the Appellate Division reversed, holding that "the trial court improperly excluded substantial portions of proffered testimony by defendant's character witnesses[;]" that "[t]he trial court also improperly submitted to the jury the full text of *Rule* 1:21–6 .... [and failed] to provide instructions to the jury on how to consider and apply the Rule's directives to the facts of this criminal case[;]" and that "certain statements made by the prosecutor during summation were so egregious that they deprived defendant of his right to a fair trial." *State v. Mahoney,* 376 *N.J.Super.* 63, 72–73, 868 *A.*2d 1171 (App.Div.2005).

We disagree with two of the three conclusions advanced by the Appellate Division. We hold that the trial court's limitation on the testimony of defendant's proffered character witnesses, prohibiting any testimony either as to specific interactions with defendant or defendant's skills as a lawyer, was proper. We also hold that the complained-of closing argument statements by the prosecutor did not deny defendant a fair trial. However, we do agree with the Appellate Division that the submission to the jury of the plain text of *R.* 1:21–6—a rule of court that details an attorney's recordkeeping and trust fund accounting requirements—without appropriate guidance from the court was error. Therefore, we

affirm in part and reverse in part the judgment of the Appellate Division, reinstate defendant's third-degree forgery convictions, and remand for a new trial on the remaining counts of the indictment charging defendant with third-degree theft by failure to make required disposition of property and third-degree misapplication of entrusted property.

## I.

As of the time relevant to this appeal, defendant had been licensed as an attorney at law in the State of New Jersey for almost twenty-eight years, the greater part of which was spent in partnership with his brother, who also is an attorney at law. Although defendant's practice included some transactional work, defendant focused almost exclusively on litigation matters. It was as part of his litigation practice that defendant was engaged to represent Clark and Barbara Ferry in connection with the wrongful death of their twenty-one year old son, Clark Jr., who was struck and killed by a car in February 1998 as he was crossing a road late at night.[1] Later that spring, when the insurance carrier for the driver of the car who struck their son sought to contact the Ferrys, they asked defendant to handle the matter for them.

In December 1998, after some initial contacts between defendant and the insurance carrier, defendant sent a retainer agreement to Barbara Ferry. After reaching agreement on the terms of defendant's retention and compensation, Mrs. Ferry signed the retainer agreement as *administratrix ad prosequendum* of her deceased son's estate. The execution of the retainer agreement was followed by a January 4, 1999 meeting at the Ocean County Surrogate's Office between the Ferrys and defendant, where both the Ferrys applied for appointment as administrators *ad prosequendum* of their son's estate. This commonplace meeting and appearance at the Surrogate's Office takes on added significance in light of later events.

---

[1] This was not the first time defendant had been retained to represent the Ferrys. As the Appellate Division noted, the Ferrys were childhood friends of defendant's secretary and defendant had represented members of the Ferry family three separate times since the mid–1980's, most recently the successful criminal defense of their son Clark Jr. in 1997. *State v. Mahoney, supra,* 376

Approximately eight days later, the Ferrys received a letter from the insurance carrier advising them that the claim concerning their son's death had been settled for the sum of $75,000. That letter also informed the Ferrys that a check in that amount, made payable to "Clark Ferry & Barbara Ferry, as Administrators Ad Prosequendum [of the] Estate of Clark Ferry, Jr., and Mahoney & Mahoney, as attorneys," had been sent to defendant. The testimony concerning the receipt of this letter was in some conflict. According to Barbara Ferry, she did not read the letter from the insurance carrier when it arrived. She left it for her husband to read and they did not discuss its contents until October 1999. In contrast, Clark Ferry testified that when he read the letter from the insurance carrier, he discussed it with his wife and asked her to call defendant for clarification of its contents. In either event, Barbara Ferry telephoned defendant in March 1999 inquiring whether the settlement funds, net of defendant's fees and expenses, could be released to them.[2] She was told by defendant that he could not do so because he was still waiting for certain tax releases.

In April 1999, the Ferrys decided to refinance their home. They again asked defendant when their $50,000 would be released to them so they could pay off their second mortgage. Defendant again stated that the funds could not yet be released, claiming the absence of purportedly necessary tax releases. After a second inquiry also relating to their proposed refinance, and after again being told that the settlement funds still could not be released due to absence of tax releases, the Ferrys abandoned their refinancing efforts. A few months later, in August 1999, Clark Ferry again contacted defendant and inquired as to the release of the $50,000 in settlement funds and was told that defendant planned to file a motion the following month for the release of the settlement funds.

---

N.J.Super. at 74, 868 A.2d 1171.

[2] The retainer agreement provided that defendant's fees would equal one-third of any recovery. As a result, the Ferrys were to receive $50,000 and defendant earned $25,000 from the $75,000 settlement.

Finally, in October 1999, Barbara Ferry contacted someone known to her who was on the staff of a New Jersey State Senator for assistance in determining what was delaying the release of the funds. It was at that point that Barbara Ferry realized that the settlement check had been issued payable to multiple payees: to Clark and Barbara Ferry, as administrators of their son's estate, and to defendant's law firm, as the attorneys for the decedent's estate. Barbara Ferry then secured a copy of the front and back of the cancelled $75,000 settlement check and for the first time became aware that it had been signed both on her behalf and her husband's behalf. Both the Ferrys testified that the signatures were not theirs and that they had not granted anyone authorization to sign on their behalf. Barbara Ferry then contacted defendant's office and was told that, at long last, the necessary releases had been secured and that the funds should be in her hands by month's end.

The Ferrys' suspicions were aroused. They contacted the Westfield Police Department, the municipality where defendant's law offices were located, and were directed to the Union County Prosecutor's Office. The Appellate Division succinctly summarized the events that followed:

> On December 16, 1999, Mrs. Ferry called defendant from the Westfield Police Department. A recording of the call was played for the jury. In the conversation, defendant tells Mrs. Ferry that he "finally got an Order signed by [a judge] that came in late November that gives the State 30 days" and that at "[t]he end of this month they should have to pay it." He told her that "they should give me something in writing that says there's no tax and ... that's the final thing." He added that "[t]he Surrogate [was] waiting on the taxing authority to give them a tax clearance certificate" and that he "figure[d]" they should have it by "the end of the year." She should expect to hear from him "[p]robably [in] a couple [of] weeks."
>
> [*State v. Mahoney, supra,* 376 *N.J.Super.* at 77, 868 *A.*2d 1171.]

Based on the information developed, the police secured a search warrant for defendant's law office and, on December 21, 1999, the police executed that search warrant and seized, among other things, defendant's file concerning the wrongful death action in respect of the Ferrys' son as well as the bank records of defendant's law firm.

At trial, the State presented the evidence outlined above. In addition, the State presented the testimony of the chief clerk of the Ocean County Surrogate's Office, the insurance carrier's claims adjuster who handled this claim, and a detective of the Union County Prosecutor's Office. The Surrogate's clerk, who was offered to rebut the explanation defendant repeatedly gave the Ferrys for the delay in disbursing the settlement funds, explained the functions of the Surrogate's Office and made clear that when, as here, a check is made payable directly to the heirs of an estate and their counsel, no court approval is required in order to disburse the funds. In essence, this testimony rebutted defendant's earlier claim that the delay in securing certain unidentified tax releases was the cause for the delay in transmitting the $50,000 in settlement funds to the Ferrys.[3]

The insurance carrier's claims adjuster testified that she had negotiated the final settlement with defendant by December 30, 1998. She also testified that she requested that defendant confirm that the Ferrys were in fact authorized to settle the estate of their dead son; that she received the relevant letters of administration from defendant on January 7, 1999, three days after they were issued; that she sent the insurance carrier's form of release to defendant; that the next day the insurance carrier received from defendant the release as purportedly executed by the Ferrys; that the $75,000 settlement check was issued and sent to defendant without delay; and that the $75,000 settlement check was deposited on January 22, 1999 in what was ultimately identified as defendant's attorney trust account.

Finally, the detective testified as to the bank records seized as a result of the execution of the search warrant on defendant's law offices. According to the bank records, before the $75,000 settlement check was deposited in defendant's attorney trust account on

---

[3] Defendant never explained why the allegedly needed but missing tax releases did not delay the disbursement of his $25,000 fee from the $75,000 in settlement funds.

January 20, 1999, defendant's attorney trust account had a balance of $250.19. Although an aggregate of $81,000 was deposited into that attorney trust account (the $75,000 settlement check on January 20, 1999 and another $6,000 deposit on January 21, 1999), by the end of that month—just eleven days later—the balance in defendant's attorney trust account was $1,905.19, entirely depleting the $50,000 in settlement monies due to the Ferrys.

Defendant testified. As summarized by the Appellate Division,

[h]e claimed that Barbara Ferry knew that he received and deposited the settlement check, because she verbally authorized him to endorse it. He lied to the Ferrys as to the status of the settlement funds to deflect their inquiries, thereby enabling him to concentrate on his treatment for prostate cancer. Although the cancer was not diagnosed until March 1999, based on his ill-health, he underwent an aggressive pre-diagnosis treatment regimen contemporaneous to the receipt of the settlement check.

Defendant acknowledged that [his law firm's] bank records, including those involving the trust account, were not maintained in proper accounting order. He attributed most of the problems to his poor health, commencing with a heart attack in 1997. His health and related emotional problems only worsened after the cancer was diagnosed. He had prostate surgery and follow-up radiation therapy. This rendered him temporarily incontinent, which, in turn, caused him to feel depressed and generally unconcerned with his business affairs.

[*Id.* at 80, 868 *A.*2d 1171.]

Defendant's testimony concerning the limitations on his ability to practice law was corroborated by two health care professionals who had treated him—a cardiologist and a psychologist.

Defendant's testimony did not go unchallenged. Among other things, the prosecutor cross-examined defendant in respect of his recordkeeping and attorney trust account obligations under *Rule* 1:21–6, as well as his repeated failures to conform to the requirements of that *Rule* despite having practiced law for such a long period of time.

Defendant was convicted of one count of third-degree theft by failure to make required disposition of property, in violation of *N.J.S.A.* 2C:20–9; one count of third-degree misapplication of entrusted property, in violation of *N.J.S.A.* 2C:21–15; and two counts of third-degree forgery, in violation of *N.J.S.A.* 2C:21–

1(a)(2). Defendant was sentenced to two concurrent three-year terms of probation and 500 hours of community service. He also was ordered to pay a $5,000 fine and the mandatory statutory penalties.

Defendant appealed. The Appellate Division reversed and remanded the matter for a new trial on three independent grounds: "based on the trial court's improper limitation of character witness testimony, inadequate jury instructions on the use of *Rule* 1:21–6, and the prosecutor's inappropriate remarks during summation." *Id.* at 98, 868 *A.*2d 1171. Specifically, the panel faulted the trial court's refusal to allow defendant's character witnesses to testify about their personal experiences with defendant, defendant's skills as an attorney, and defendant's professional relationships with his clients and others. The panel also took issue with the prosecutor's argument that defendant's eventual payment of the monies due to the Ferrys did not excuse his conduct. In essence, the prosecutor drew analogies between defendant's "no-harm-no-foul" defense to shoplifters who are caught as they are leaving the store and seek to avoid liability by returning the shoplifted items, or to a burglar who is observed and, when the stolen object is discovered in the burglar's possession, returns the stolen object and claims that the only thing standing in the way of his returning the stolen object is "if the person had asked me enough times for [it] back I would have given it to them." According to the Appellate Division, "[b]y relying on factual scenarios completely unrelated to the crimes for which defendant was charged, the prosecutor's hypothetical scenarios improperly suggested to the jury that it was unnecessary for the State to prove at what point defendant's conduct became criminal." *Id.* at 85, 868 *A.*2d 1171. Finally, the panel also faulted the trial court's handling of the prosecutor's use of *Rule* 1:21–6 as a standard of conduct in respect of defendant's record-keeping and trust account activities.

The State sought certification and the defendant cross-petitioned for certification. We granted the State's petition, but

denied that of defendant.[4] *State v. Mahoney,* 185 *N.J.* 35, 878 *A.*2d 852 (2005). For the reasons that follow, we affirm in part and reverse in part the judgment of the Appellate Division and remand this cause to the Law Division for reinstatement of defendant's forgery convictions, and for a new trial in respect of those counts of the indictment charging defendant with theft by failure to make required disposition of property and misapplication of entrusted property.

## II.

### A.

We address first the trial court's refusal to allow defendant to present character witnesses to testify either as to defendant's general character traits as an attorney or to specific instances of interactions with defendant, all for the purpose of demonstrating defendant's good character and lack of propensity to commit the acts for which he stood charged. On this point, the Appellate Division reversed, holding that "defendant was entitled to present testimonial evidence attesting to his skill and care as an attorney in order to rebut the State's contention that his failure to timely disburse clients' funds constituted the criminal offense of failing to make required disposition of property." *State v. Mahoney, supra,* 376 *N.J.Super.* at 72, 868 *A.*2d 1171. We disagree.

Defendant tendered an aggregate of eight character witnesses.[5] At the trial court's request, defendant presented a proffer of the expected testimony of each of the proposed character witnesses. Relying on *N.J.R.E.* 404(a)(1), 405 and 406, defendant summarized the import of his proffered character witnesses as follows:

---

[4] Defendant sought certification on five separate questions. None "present[ed] a question of general public importance which has not been but should be settled by the Supreme Court or is similar to a question presented on another appeal to the Supreme Court;" alleged a decisional conflict within the Appellate Division; "call[ed] for an exercise of the Supreme Court's supervision[;]" or otherwise presented a matter where "the interest of justice [so] requires." *R.* 2:12–4.

[5] Some of these character witnesses could have been fairly characterized as hybrid fact/character witnesses.

A person's ability as an attorney is the central issue at trial here. It's not just he's an honest guy, but the reason I have a high opinion of him is he's an honest guy who is a good lawyer.

I think you can't just try or you just can't do it in a vacuum and say he's an honest lawyer that's why I have a good opinion of him. I have [a] good opinion of him because he's an honest lawyer and diligent lawyer. He goes the extra mile for me. He always puts himself out. I think that's a character trait that's in question here.

In its preliminary response to defendant's proffer, the trial court noted:

It seems to me that the testimony is that, the testimony that I knew the defendant for, you know, X number of years in the following context, business context, social context; that I talked to people in the community who have dealings with him or I have a lot of dealings with him on a business level as a real estate person, as a client, as another lawyer, and based on my contacts with him or my speaking to people in the legal community or in the real estate community or the business community I have the following opinion of his trustworthiness and honesty or his reputation in the community for trustworthiness and honesty. I mean that's pretty straightforward stuff. I mean I think that's what you'd expect out of any character witness.

. . . .

The defense is proffering this as a character trait which is a little bit different than character evidence. I'm not sure that being a diligent lawyer is necessarily or being a diligent anything is a character trait that's relevant to what's going on here. . . .

The following day, after considering the submissions of counsel and hearing additional argument on the matter, the trial court ruled that "assuming there's a foundation laid, [defendant's character witnesses] can testify as to their opinion or the defendant's reputation in the community as to honesty, trustworthiness, integrity and diligence." After making clear the permitted scope of the testimony of defendant's character witnesses, the trial court set out the limitations placed on that testimony:

I will preclude these character witnesses from testifying as to whether or not they were satisfied with the defendant as an attorney, their opinion of him as an attorney; that they would still be hiring him as a lawyer today; that they referred other clients to him; that he's handled millions of dollars for [a] particular client through trust accounts. I find those are not character traits, they are not pertinent, and they are specific instances of conduct and not opinion or reputation testimony.

I will also add that from these character witnesses there will be no reference to the defendant's health, heart attack, cancer, fatigue, medication and no testimony regarding specific instances of conduct as prohibited by rule 405.

Defendant's character witnesses testified in compliance with the trial court's directives.

The Appellate Division found error in the limitations placed on the scope of the testimony to be adduced from defendant's character witnesses. According to the panel,

[u]nder *N.J.R.E.* 404(a)(1), defendant was entitled to present testimonial evidence attesting to his professional relationship with other clients. Such evidence directly relates to the crucial issue in this case, to wit, whether defendant's failure to turnover the settlement funds in a timely fashion is indicative of a criminal intent to perpetrate a theft, or of mere negligence brought about by sloppy recordkeeping and poor health.

The court also erred when it excluded the testimony of witnesses' personal experiences with defendant that formed the basis for their opinions of his character. Without such a foundation, character testimony is reduced to a net opinion. In evaluating the value and legitimacy of the witnesses' opinion, the jury is entitled to consider the experiences that the witness and defendant have shared, and how they illuminate and reveal the content of a person's character.

[*Id.* at 82–83, 868 *A.*2d 1171.]

## B.

Whether proffered opinion or reputation evidence fits under the rubric of permissible character testimony is governed by *N.J.R.E.* 404, which, in relevant part, provides:

(a) Character evidence generally. Evidence of a person's character or character trait, including a trait of care or skill or lack thereof, is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion except:

(1) Character of accused. Evidence of a pertinent trait of the accused's character offered by the accused, which shall not be excluded under *Rule* 403, or by the prosecution to rebut the same;

. . .

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

(c) Character and character trait in issue. Evidence of a person's character or trait of character is admissible when that character or trait is an element of a claim or defense.[6]

*N.J.R.E.* 404 cannot be read in isolation; any analysis of the propriety of character evidence is limited by the methods by which such proofs can be adduced. *N.J.R.E.* 405(a) explains that, in general, "[w]hen evidence of character or a trait of character of a person is admissible, it may be proved by evidence of reputation, evidence in the form of opinion, or evidence of conviction of a crime which tends to prove the trait." Because the character evidence proffered by defendant did not include evidence that defendant was convicted of any crime, defendant was limited to offering character evidence of only two types: opinion or reputation evidence. Even if the evidence proffered is properly characterized as character evidence and is in the correct form of opinion or reputation evidence, that evidence nevertheless must be relevant as a prerequisite for admissibility. *N.J.R.E.* 402.

 It has long been held in this State that

[i]t is the right of a person charged with crime to have all the relevant testimony, including that relating to his good character or reputation, considered by the jury in every case, and if, on such consideration, there exists reasonable doubt of his guilt, even though that doubt be engendered merely by his previous good repute, he is entitled to an acquittal. . . . The principle above stated holds even in cases where the crime consists of a single misdeed, of which many a person of good reputation may be guilty; in cases like the present, where guilt implies the notorious practice of a vicious habit,[7] a general reputation of a contrary disposition seems to be direct evidence of innocence, and therefore entitled to the greater weight.

[*Baker v. State*, 53 *N.J.L.* 45, 47, 20 *A.* 858 (Sup.Ct.1890) (citations omitted).]

---

[6] The language of *Evidence Rule* 404 here cited differs in an immaterial respect from the language of the *Rule* extant at the time of defendant's trial in 2002. Effective July 1, 2005, paragraphs (a) and (b) of the *Rule* were amended to incorporate gender-neutral language; no substantive changes to the *Rule* were adopted.

[7] The defendant in *Baker v. State* was convicted of being a common scold, that is, "[a] person who regularly breaks the peace by scolding people, increasing discord, and generally being a public nuisance to the neighborhood. This behavior was formerly punishable in various ways, including having an iron bridle fitted to the person's mouth." *Black's Law Dictionary* 1348 (7th ed.1999).

The passage of time has not diminished the import of *Baker v. State*. We are still governed by the principle that "[e]vidence of good character may be sufficient in itself to raise a doubt as to the guilt of the defendant, and it must be considered along with all the other evidence in the case and not restricted to situations where the other evidence itself raises a doubt." *State v. Siciliano*, 21 *N.J.* 249, 260–61, 121 *A.*2d 490 (1956).

 Applying these principles, we conclude that the trial court correctly ruled that defendant's character witnesses could properly "testify as to their opinion or the defendant's reputation in the community as to honesty, trustworthiness, [and] integrity. . . ." In respect of the additional matters defendant wished to elicit from these character witnesses—testimony concerning defendant's military service, defendant's interactions with other attorneys and clients, or defendant's perceived skills as a lawyer— we also conclude that the trial court correctly barred that testimony because it was not relevant to the discrete issues in this case. Those issues are: did defendant engage in an act of theft by failing to make the required disposition of the settlement funds to the Ferrys, did defendant misapply the settlement funds that were entrusted to him, and did defendant forge the Ferrys' signatures on the settlement checks? Our rules bar not only impeachment of a witness through specific instances of conduct, but also evidence concerning how defendant acted in instances other than those at issue in the case because the alternative inevitably will result in "minitrials on collateral matters that tend to distract and confuse the jury[.]" *State v. Guenther*, 181 *N.J.* 129, 142, 854 *A.*2d 308 (2004) (citations and internal quotation marks omitted). Those considerations apply with equal force here and justify the limitations the trial court imposed on the scope of the testimony defendant sought to elicit from his character witnesses.

### III.

#### A.

 Defendant next complains that certain statements made by the prosecutor in her summation to the jury were so improper as

to deny defendant a fair trial. The Appellate Division agreed and held that

> certain statements made by the prosecutor during summation were so egregious that they deprived defendant of his right to a fair trial. These involved a hypothetical scenario entirely unrelated to the crimes for which defendant was charged, and suggested that it was unnecessary for the State to prove at which point defendant's conduct became criminal.
>
> [*State v. Mahoney, supra,* 376 *N.J.Super.* at 73, 868 *A.*2d 1171.]

We must, again, disagree with the panel's conclusions.

One of defendant's principal trial defenses was that because the Ferrys ultimately received the settlement funds that were due to them—albeit over eleven months after he had deposited the settlement check in his escrow account, ten days after the police executed a search warrant on and seized his law firm's records, and although defendant himself conceded he repeatedly had lied to the Ferrys concerning his ability to disburse the settlement funds—no harm inured to anyone by his actions and, hence, he should escape liability for them. Responding to that defense, the prosecutor argued to the jury as follows:

> [THE PROSECUTOR]: And I would submit to you but for that search warrant, Mr. Mahoney would never have given the money or he'd have been putting them off and putting them off and putting them off for however long they would believe his lies because he only paid that back after the search warrant was executed. And again I would submit to you that the defense argument that they got their money therefore, he didn't have any criminal intent and he didn't commit a theft, that is ridiculous. I'll give you a whole bunch of examples.
>
> *Somebody who is shoplifting at a store and gets caught by the security guard on the way out and then says well, I still have it inside my pocket. Here, you can have it back. So now I didn't commit a shoplifting. Or somebody goes into a person's house and commits a burglary and takes an expensive piece of jewelry and witness sees who the person is and person gets away.*
>
> [DEFENSE COUNSEL]: Judge, I object.
>
> THE COURT: Overruled.
>
> [THE PROSECUTOR]: *And then an arrest warrant is issued for that person and 11 months later the person is arrested, and then the person says oh, here's that watch. You can have it back now. I didn't commit the burglary. And there's no theft because I didn't have any intent.* And, you know, if the person had asked me enough times for their watch back I would have give [sic] it to them.
>
> The defendant through his own testimony seems to imply that the Ferrys had some responsibility to call him everyday and ask for their money, and meanwhile he's lying to them.

[ (emphasis supplied.) ]

After marshalling the authority governing the limits of permissible argument by a prosecutor in summation, the Appellate Division implicitly accepted defendant's argument that, disregarding any events in the interim between defendant's receipt of the settlement funds and his eleventh-hour disbursement of those funds to the Ferrys, the fact that he ultimately paid the Ferrys the sums due to them raised the issue of whether a crime had been committed and, if so, when. Specifically, the panel concluded that "[b]ecause defendant did, at one point, disburse the funds to the Ferrys, there was a legitimate and critical threshold issue for the jury to decide; that is, whether an actual crime had been committed." *Id.* at 84, 868 *A*.2d 1171. Having so concluded, it was but a short step for the Appellate Division to reason that "at no point in the presentation of evidence or during summation did the prosecutor clarify for the jury the State's position as to when the crime was committed" and that "[w]ithout legal guidance in this area, the jury was left on its own to determine when the theft crime was completed by defendant." *Ibid.* The panel completed its analysis thusly:

> Determining that a prosecutor's summation exceeded the bounds of fair comment on the evidence is insufficient, in and of itself, to warrant reversal. We must also determine whether these comments were so prejudicial that they deprived defendant of his constitutional right to a fair trial. In making this determination, we must consider: (1) whether defense counsel interposed a timely objection to the remarks; (2) whether the remarks were withdrawn; and (3) whether the court ordered the remarks stricken and instructed the jury to ignore them.

[*Id.* at 85, 868 *A*.2d 1171 (citations omitted).]

The Appellate Division held that, because the trial court overruled defendant's objection to the challenged remarks, "the court missed the opportunity to mitigate the harm by issuing a properly tailored instruction directing the jury to disregard the prosecutor's statements" and that "[o]verruling defendant's objection also communicated to the jury the court's tacit endorsement of the prosecutor's incorrect expressions of the applicable law." *Ibid.*

## B.

The seminal role prosecutors play in our system of criminal justice bears repeating:

> [W]ithin the legal profession the prosecutor's double calling—to represent vigorously the state's interest in law enforcement and at the same time help assure that the accused is treated fairly and that justice is done—is uniquely challenging. That challenge is what makes the prosecutor's mission such a difficult one and such an honorable one. A prosecutor willing to engage in proscribed conduct to obtain a conviction ... betrays his oath in both its respects. Not only does he scoff at rather than seek justice, he also represents the state poorly.
>
> [*State v. Ramseur*, 106 *N.J.* 123, 323–24, 524 *A.*2d 188 (1987), *cert. denied*, 508 *U.S.* 947, 113 *S.Ct.* 2433, 124 *L.Ed.*2d 653 (1993).]

A determination whether a prosecutor has acted within that special role is informed by the standard under which a prosecutor's statements in summation are to be gauged: "Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented. Indeed, prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries." *State v. Frost*, 158 *N.J.* 76, 82, 727 *A.*2d 1 (1999) (internal quotations and citations omitted). It is now well-settled that

> prosecutors should not make inaccurate legal or factual assertions during a trial and that they must confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence. We have acknowledged that if a prosecutor's arguments are based on the facts of the case and reasonable inferences therefrom, what is said in discussing them, by way of comment, denunciation or appeal will afford no ground for reversal. However, we have not hesitated to reverse convictions where we have found that the prosecutor in his summation over-stepped the bounds of propriety and created a real danger of prejudice to the accused.
>
> [*State v. Smith*, 167 *N.J.* 158, 178, 770 *A.*2d 255 (2001) (citations and internal quotation marks omitted).]

The prosecutor's comments were fairly "based on the facts of the case and reasonable inferences therefrom," were well within "the bounds of propriety[,]" and did not "create a real danger of prejudice to the accused." On the contrary, the prosecutor's comments legitimately placed an unforgiving and harsh glare on defendant's "no-harm-no-foul" defense. In light of the defense advanced by defendant, it was entirely proper for the prosecutor

to point out that, once defendant had completed the crimes for which he stood charged, returning the funds he stole does not negate an element of the offenses charged, although it may be a mitigating factor at sentencing.

## IV.

■ Because the operative facts in this case arose from defendant's failure to maintain sufficient funds in his trust account in order to pay the Ferrys the monies due to them in a timely manner, a significant portion of the controversy in respect of those counts of the indictment charging defendant with theft by failure to make required disposition of property and misapplication of entrusted property revolved around defendant's compliance with *R*. 1:21–6. That *Rule* outlines in detail the recordkeeping, trust and business bank account format and location, and disclosure obligations imposed on all lawyers who practice in this State. In her cross-examination of defendant, the prosecutor made use of the requirements of *R*. 1:21–6 and defendant's admitted multiple failures to comply with its provisions. Outside of the hearing of the jury at the close of all of the evidence, but before closing arguments or the court's charge to the jury, the prosecutor offered the text of the *Rule* as an exhibit in evidence. Defendant objected, claiming that the probative value of the text of *R*. 1:21–6 was outweighed by its claimed unduly prejudicial effect. The trial court remarked on the *Rule's* use in defendant's cross-examination, ruled that it was relevant, and determined that the balancing of its probative value against any undue prejudice required under *N.J.R.E.* 403 tipped in favor of its admissibility. Having done so, the trial court, immediately upon the jury's return to the courtroom, instructed the jury as follows:

There are a couple of additional things that are [going to] be in evidence that I just want to mention to you. There's exhibits D–41 and D–42 and S–125. And what they are is D–41 and 42 are the New Jersey statutes that deal with refunding bonds and letters of administration that you heard about. So that if you wish to look at these New Jersey laws while you're deliberating you will have them.

S–125 is a New Jersey court rule regarding records, keeping of attorney trust fund and what kind of records you have to keep and how you have to keep them. You also heard testimony about them. So if you wish during your deliberations to

refer to that or read it, that will be in evidence also. And you'll have that in with your packet of exhibits.

Shortly after that instruction, both the prosecution and the defense delivered their closing statements to the jury.

In its charge to the jury the following trial day, the trial court made no reference to any limitations on the use the jury could make of *R.* 1:21–6 during its deliberations. The only reference made to the jury's use of this exhibit was oblique: the trial court instructed the jury that, in considering the elements of the offense of misapplication of entrusted property, "[h]aving insufficient funds in one's trust account to cover an attorney's obligation to his clients is not in and of itself a criminal violation. As mentioned above, in order to find the defendant guilty of this offense, the State must prove all of the above elements beyond a reasonable doubt."

The Appellate Division held that

[t]he trial court correctly ruled that evidence showing defendant's failure to comply with the Rule's requirements was *relevant* to the jury's determination of guilt or innocence. The error here lies in the court's failure to limit the scope of the prosecutor's cross-examination of defendant. This error was compounded when the court permitted the jury to receive the entire text of this complex rule of accounting, without any instruction as to how it related to the issue of defendant's criminal intent.

[*State v. Mahoney, supra,* 376 *N.J.Super.* at 86, 868 *A.*2d 1171.]

Although the panel found fault with "the court's failure to limit the scope of the prosecutor's cross-examination of defendant" in respect of the prosecutor's use of *R.* 1:21–6, it did not explain or support that conclusion. A careful review of that cross-examination discloses, however, that it did not elicit a single objection from defendant concerning the use of *R.* 1:21–6 as a standard of conduct. Because we cannot find that the prosecutor's use of *R.* 1:21–6 was error clearly capable of producing an unjust result, we find no basis to support the panel's view that the scope of the prosecutor's cross-examination of defendant in respect of his *R.* 1:21–6 obligations should have been limited. To that extent, we disavow the Appellate Division's holding that "[t]he error here lies

in the court's failure to limit the scope of the prosecutor's cross-examination of defendant."

However, we are in accord with the Appellate Division's later holding that the trial court's failure to instruct the jury on how to consider and apply *R.* 1:21-6 to the facts of this criminal case warrants the reversal of defendant's conviction for theft by failure to make required disposition of property and misapplication of entrusted property. In this respect, because the unexplained admission of a rule of attorney conduct carries the certain risk that the jury could conflate the *Rule's* requirements with those necessary for the imputation of criminal liability, we endorse the panel's analysis and commend it as the proper instruction to be given on remand:

> [I]t is the court's obligation to guide the jury in its search for the truth. Proper jury instructions in this area must begin by emphasizing that the State bears the burden of proving defendant guilty beyond a reasonable doubt as to each and every element of the crime. This burden is not diminished or transferred to defendant because he may have committed an ethical violation. The jury must be told that the [recordkeeping and] accounting practices delineated in the Rule are relevant to determining defendant's state of mind, because they placed defendant on notice as to what was expected of him when he became the custodian of client funds. But, that is not the end of the jury's inquiry.
>
> A violation of the Rule's requirements, in and of itself, is insufficient, as a matter of law, to sustain a finding of criminal culpability. However, together with any other evidence in the case, a jury may consider a violation of the Rule's requirements as evidence of defendant's purposeful conduct. The more egregious the violation, the greater its probative value is in assisting the jury in this determination. An extended pattern of conduct, displaying an utter disregard for the Rule's requirements, would have more probative value than an isolated incident of bad [recordkeeping or] accounting.
>
> [*State v. Mahoney, supra,* 376 *N.J.Super.* at 92, 868 *A.*2d 1171.]

## V.

The Appellate Division's judgment that "the trial court improperly excluded substantial portions of proffered testimony by defendant's character witnesses" is reversed, and we hold that the trial court's limitation on the testimony of defendant's proffered character witnesses, prohibiting any testimony either as to specific interactions with defendant or defendant's skills as a lawyer, was proper. The Appellate Division's judgment that "certain statements made by the prosecutor during summation were so egre-

gious that they deprived defendant of his right to a fair trial" also is reversed and we hold, instead, that the complained-of closing argument statements by the prosecutor did not deny defendant a fair trial. The Appellate Division's holding that the trial court erred in failing to limit the scope of the prosecutor's cross-examination of defendant in respect of defendant's recordkeeping and trust account obligations pursuant to *R.* 1:21–6 is also reversed. However, we affirm the Appellate Division's judgment that the trial court "improperly submitted to the jury the full text of *Rule* 1:21–6 ... [due to] the court's failure to provide instructions to the jury on how to consider and apply the Rule's directives to the facts of this criminal case."

The judgment of the Appellate Division is affirmed in part and reversed in part, defendant's forgery convictions are reinstated, and the matter is remanded to the Law Division for further proceedings consistent with this opinion in respect of those counts of the indictment charging defendant with theft by failure to make required disposition of property and misapplication of entrusted property.

*For affirmance in part; reversal in part/remandment*—Chief Justice PORITZ, Justices LaVECCHIA, ZAZZALI, ALBIN, WALLACE join in Justice RIVERA–SOTO's opinion. Justice LONG did not participate.

*Opposed*—None.