**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4777-16T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ROLAND E. AMOS,

     Defendant-Appellant.

_____

           Submitted April 2, 2019 – Decided May 13, 2019

           Before Judges Yannotti, Rothstadt and Natali.

           On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Indictments Nos. 15-01-0110, and 15-01-0115.

           Joseph E. Krakora, Public Defender, attorney for appellant (Michael J. Confusione, Designated Counsel, on the brief).

           Andrew C. Carey, Middlesex County Prosecutor, attorney for respondent (David M. Liston, Assistant Prosecutor, of counsel and on the briefs).

           Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant was tried before a jury and found guilty of first-degree murder and other offenses, as charged in two Middlesex County indictments. Defendant appeals from the judgments of conviction entered by the trial court. We affirm.

I.

In Indictment No. 15-01-0110, defendant was charged with first-degree murder of Brian Hoey, N.J.S.A. 2C:11-3(a)(1) or (2), with the aggravating factor of committing murder to escape detection, in violation of N.J.S.A. 2C:11-3(b)(4)(f) (count one). Defendant also was charged with second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count two); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count three); two counts of third-degree witness tampering, N.J.S.A. 2C:28-5(a)(1) and (a)(2) (counts four and five); two counts of third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b)(1) and (b)(4) (counts six and eight); and second-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b)(3) (count seven). Furthermore, in Indictment No. 15-01-0115, defendant was charged with second-degree certain persons not to have weapons, in violation of N.J.S.A. 2C:39-7(b).

Prior to defendant's first trial, the judge granted the State's motion for permission to introduce evidence that Hoey had implicated defendant in the use of counterfeit currency to purchase money orders. Following the first trial, the jury found defendant guilty on counts four, five and six, which charged defendant with witness tampering and third-degree hindering apprehension by concealing evidence, but not guilty of hindering apprehension by giving false information to a law enforcement officer (count eight). The jury was unable to reach a verdict on the murder charge (count one), the weapons charges (counts two and three), and second-degree hindering apprehension (count seven).

Before the second trial, defendant filed a motion for reconsideration of the court's prior order allowing the State to introduce evidence that Hoey implicated defendant in the use of counterfeit money. The judge for the second trial denied the motion. At the second trial, the State presented evidence, which established that in the early morning hours of September 1, 2014, Hoey was shot multiple times while he was standing outside his townhouse on Schmidt Lane in North Brunswick, where he was smoking a cigarette. P.P., Hoey's girlfriend, called

3

9-1-1.[1] An officer from the North Brunswick Police Department (NBPD) responded to the scene. Efforts to save Hoey's life were unsuccessful. He died less than half an hour later at a hospital.

Detective Bree Curran of the Middlesex County Prosecutor's Office (MCPO) arrived at Hoey's townhouse and canvassed the scene. In addition to seven .45 caliber shell casings and six .45 caliber projectiles or projectile fragments, Curran photographed and collected three cigarette butts. It was later determined that all of the bullets were fired from the same gun.

One of the cigarette butts, which was the brand that Hoey smoked, was still burning on the sidewalk outside his townhouse when the police arrived. That cigarette was sent for DNA testing, but the results did not match Hoey or defendant.

Around 3:50 a.m., defendant, who was known as "Universal," attempted to enter defendant's townhouse where he lived with Z.R., which was next door to Hoey's residence. Detective Robert Powell of the NBPD and Detective Gregory Morris of the MCPO asked defendant where he was coming from. Defendant said he had been with his girlfriend, S.S., and later at a barbecue in Newark.

---

[1] We use initials to identify certain individuals to protect their privacy.

A-4777-16T1

Defendant had a cell phone in his hand, and when Morris asked for his phone number, defendant gave the detectives a number. Powell called the number from his own cell phone, but defendant's phone did not ring. When Powell asked why the phone was not ringing, defendant responded that he gave the detective the number for another phone, which he pulled out of his pocket.

Powell then asked for the number to that phone, and defendant provided another number. The detectives also asked defendant for S.S.'s number, which he provided. The investigators later obtained call records for one of the numbers defendant had provided. The records suggested that defendant was in the area of Hoey's residence at 12:42 a.m. and at 3:42 a.m. The records also showed that at 1:53 a.m., defendant was in Clark, New Jersey.

On September 4, 2014, Powell interviewed S.S., and she told Powell she was with defendant the day before Hoey was killed. S.S. said that she and defendant had gone to dinner and thereafter, they went shopping for a car. Afterwards, S.S. and defendant stopped at a liquor store and at approximately 8:30 p.m., he left to go to a barbecue. At 10:50 p.m. defendant called S.S. and said he needed a ride home from Newark.

S.S. stated that she drove to Newark and picked up defendant. They went to her apartment in Rahway, arriving there shortly after midnight. According to

S.S., between 12:30 a.m. and 1:00 a.m., defendant walked to a donut shop to get a coffee and called S.S. on his way to see if she wanted anything. At 3:00 a.m., S.S. drove defendant to the townhouse in North Brunswick, which took twenty-five to thirty minutes. On September 11, 2014, the investigators again spoke with S.S., but she did not provide them with any additional information.

On October 2, 2014, the detectives confronted S.S. with information they had obtained from defendant's cell phone records, and told her she had not been telling the truth. S.S. initially repeated substantially the same story that she told the detectives previously, but later admitted that the story was false. She told the detectives that after she and defendant went to dinner, defendant left around 8:00 p.m. to go to the barbecue, and she did not see him again until approximately 1:53 a.m., when he called and said, "Open the door, I'm coming."

According to S.S., defendant entered her apartment and removed his shirt, which he put in a plastic bag. He also asked her for a shoebox, and she gave him a grey Nike shoebox. S.S. stated that defendant told her, "I want you to come with me to my mother's. I have to drop off my car in Newark." They drove to Newark in separate cars.

As they were driving through Irvington, defendant flashed his high beams, signaling that S.S. should pull over. They stopped behind a strip mall. S.S. did

6

not see what defendant did when he got out of his car. She believed he threw a garbage bag and shoebox into a dumpster. They proceeded to Newark, and defendant parked his car at his mother's house. S.S. then drove defendant to his townhouse in North Brunswick. S.S. said she never saw a gun.

S.S. told the detectives that defendant had a "run in" with his neighbor, and as a result, the police had come to defendant's house. Defendant told S.S. this incident had been "bothering him," but he had "taken care of" the problem. Defendant also told S.S. that the police "ha[d] nothing on [him]" and would never find the gun. He urged her "to be strong" and "go with the story." S.S. said that previously she had lied to the police because she was scared of defendant and he had threatened her, saying, "if I felt like you were telling on me or doing anything to get me jammed up, I would have been killed you."

S.S. accompanied the detectives on the route she had driven with defendant during the early morning hours of September 1, 2014. She directed the detectives to the rear of the strip mall, which had four dumpsters, three of which were locked. The unlocked dumpster was empty. S.S. and the detectives then drove to defendant's mother's house and back to NBPD headquarters, where S.S. continued her recorded statement. She swore that she had been truthful in her statement.

A-4777-16T1

At trial, the State called S.S. as a witness. She initially testified that she did not recall providing a statement to the detectives, and later stated that she could not remember what she told them. After further questioning, oral argument by counsel, and conducting a Rule 104 hearing, the judge allowed the State to play S.S.'s recorded statement for the jury.

In addition, P.P. testified that approximately eleven months before Hoey was killed, defendant gave Hoey currency and asked him to purchase money orders. According to P.P., defendant sent Hoey a text message, which stated, "[L]isten, I have to rush and go to the movies with my lady. Can you get out and go to Walmart and get two $500 money orders, and I'll give you a gift when I get back[?]"

Officer James Karas of the NBPD testified that on October 3, 2013, he arrested Hoey at a Walmart store and charged him with attempting to use ten counterfeit one hundred dollar bills to buy money orders. Hoey told Karas that "Universal" gave him the money and asked him to buy the money orders as a favor.

Detective Michael Braun of the NBPD interviewed Hoey after Karas arrested him. Braun testified that Hoey identified defendant as the person who gave him the counterfeit money. Hoey showed Braun the text message in which

defendant had asked him to purchase two $500 money orders at Walmart in exchange for "a gift."

Braun also testified that in October 2013, Z.R. consented to a search of the townhouse, but that the police did not find any counterfeit money there. When Z.R. told defendant about the search, "[h]e wasn't happy." Z.R. testified that she never saw defendant with a gun or with counterfeit money. She also said she never observed any animosity between defendant and Hoey.

The jury found defendant guilty of murdering Hoey, but not guilty of the aggravating factor charged in the indictment. The jury also found defendant guilty of the weapons charges (counts two and three), and hindering his own apprehension or prosecution (count seven). Defendant then was tried on the certain persons offense charged in Indictment No. 15-01-0115. The jury found defendant guilty of that offense.

On appeal, defendant's attorney raises the following arguments: (1) "[t]he trial court erred in denying defendant's motion for acquittal and judgment notwithstanding [the] verdict"; (2) the trial court erred by permitting the State to admit evidence regarding the counterfeit money incident; (3) the trial court erred by permitting S.S.'s prior inconsistent statements to be admitted into evidence in the State's case-in-chief; (4) "[t]he prosecutor's statements to the

9

jury went beyond fair comment on the evidence"; and (5) the "sentence is improper and excessive."

Defendant has filed a supplemental pro se brief in which he argues: (1) the judge erred by denying the motion for a judgment of acquittal and judgment notwithstanding the verdict because his "guilt was in doubt"; (2) the judge did not properly exercise his discretion when he admitted evidence regarding the counterfeit money incident; (3) the judge erred by admitting S.S.'s recorded statement; (4) the judge erred by denying his motion for a mistrial based on the prosecutor's summation; and (5) the judge improperly interfered with the right to counsel of his choice, which warrants reversal of his convictions.

## II.

We first consider defendant's argument that the trial court erred by allowing the State to introduce testimony that Hoey implicated him in the attempted use of counterfeit money. Defendant argues that this was evidence of another crime, and it should have been excluded under Rule 404(b). See N.J.R.E. 404(b). We disagree.

Here, the judge ruled before the first trial that the evidence was admissible as intrinsic evidence because it directly established the purposeful and intentional nature of the killing. The judge found that admissibility of the

evidence was determined under Rule 403, and its probative value was not substantially outweighed by the risk of undue prejudice to defendant. See N.J.R.E. 403. The judge for the second trial reaffirmed that ruling.

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. State v. Rose, 206 N.J. 141, 157 (2011) (citing Brenman v. Demello, 191 N.J. 18, 31 (2007)). Our review is de novo, however, if the court applied the wrong test or failed to perform the required analysis. State v. Garrison, 228 N.J. 182, 194 (2017) (citing Rose, 206 N.J. at 158).

Relevant evidence is presumptively admissible under Rule 402, but may be found inadmissible under Rule 403 "if its probative value is substantially outweighed by the risk of . . . undue prejudice[.]" Moreover, Rule 404(b) states that

> evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
>
> [N.J.R.E. 404(b).]

"The threshold determination . . . is whether the evidence relates to 'other crimes,' and thus is subject to . . . analysis under Rule 404(b), or whether it is

evidence intrinsic to the charged crime, and thus need only satisfy the evidence rules relating to relevancy, most importantly Rule 403." Rose, 206 N.J. at 179. To determine if evidence "is intrinsic to the charged crime," the Court in Rose adopted a test enunciated in United States v. Green, 617 F.3d 233 (3d Cir. 2010). Rose, 206 N.J. at 180.

The Court held that "two narrow categories of evidence" of other bad acts are intrinsic to the charged crime: (1) evidence that "directly proves the charged" crime; and (2) evidence of bad "acts performed contemporaneously with the charged crime" that "facilitate[d] the commission of the charged crime." Ibid. (quoting Green, 617 F.3d at 248-49). Any evidence of other bad acts not fitting within one of those two "tight description[s] of intrinsic evidence" must be analyzed under Rule 404(b). See id. at 181.

Here, the motion judge stated that Rose allowed the State to introduce "background information" regarding the charged offenses. In Rose, 206 N.J. at 180-81, the Court instructed lower courts to analyze such "background information" under Rule 404(b) instead of labeling it intrinsic to the charged crime and analyzing it under Rule 403.

The judge found that the evidence regarding the use of the counterfeit money was intrinsic because it "'directly prove[d]' the purposeful and intentional

A-4777-16T1

nature of the killing" under N.J.S.A. 2C:11-3(a)(1) or (2). Hoey, however, was shot multiple times, and there was no claim that he was shot by accident. There was no dispute that whoever shot him did so purposely and/or knowingly. See N.J.S.A. 2C:2-2(b)(1) and (2) (defining mental states "purposely" and "knowingly"); see also Model Jury Charges (Criminal), "Murder (N.J.S.A. 2C:11-3(a)(1) and 3(a)(2)" (rev. June 14, 2004). Therefore, the counterfeit-money evidence did not go to the purposeful or intentional nature of the murder, but instead to defendant's motive for killing Hoey.

As the trial judge recognized, the State is not required to prove a defendant's motive, and evidence of other bad acts used to show a defendant's motive is evidence generally analyzed under Rule 404(b). See N.J.R.E. 404(b) (stating the evidence of other bad acts may be used to show "proof of motive"). However, pursuant to N.J.S.A. 2C:11-3(b)(4), if the jury finds that the defendant committed murder by his own conduct and also "finds beyond a reasonable doubt" one of twelve "aggravating factors," the defendant must be sentenced to life in prison without the possibility of parole.[2]

---

[2] These twelve "aggravating factors" are sometimes called "triggering factors" and must be charged by a grand jury and found by a jury beyond a reasonable doubt. See State v. Troxell, 434 N.J. Super. 502, 510 (App. Div. 2014).

One of those aggravating factors, with which defendant was charged in the indictment, is that "[t]he murder was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by the defendant or another" under N.J.S.A. 2C:11-3(b)(4)(f).  The counterfeit-money evidence went directly to proving that aggravating factor, as it was the only evidence that tended to show that defendant killed Hoey in order to avoid possible apprehension and punishment for the counterfeiting offense. The counterfeit money evidence was intrinsic because it "directly proved" the aggravating factor charged in count 1(A) of the indictment.

Therefore, the trial court correctly determined that a Rule 404(b) analysis was not required.  The court analyzed the evidence under Rule 403, and the record supports the trial court's determination that the probative value of the evidence was not substantially outweighed by the risk of undue prejudice to defendant resulting from its admission.  Although the evidence may have been prejudicial, "it was prejudicial in the way that all highly probative evidence is prejudicial: because it tends to prove a material issue in dispute."  Rose, 206 N.J. at 164.

This evidence did not create "a significant likelihood that the jury would convict defendant on the basis of the uncharged misconduct because he was a

bad person, and not on the basis of the actual evidence adduced against him."
See ibid. Instead, "it was admitted for the proper purpose of explaining why
defendant committed this particular crime[.]" See ibid.

### III.

Next, defendant argues that the trial court erred by admitting S.S.'s
recorded statement into evidence because it was unreliable. Again, we disagree.

Rule 803 governs the admissibility of prior statements. N.J.R.E. 803.
Under Rule 803(a), a prior inconsistent statement of a trial witness is not
excluded as hearsay if the statement would have been admissible if made while
the witness was testifying and was offered in accordance with Rule 613. When
the prior inconsistent statement is offered by the party calling the witness, Rule
803(a)(1) requires that the statement be "contained in a sound recording or . . .
writing made or signed by the witness [under] circumstances establishing its
reliability[.]" N.J.R.E. 803(a)(1)(A).

The party seeking to admit the prior inconsistent statement must prove
that it is reliable by a preponderance of the evidence, a determination that the
court should make in a Rule 104 hearing outside the presence of the jury. See
State v. Gross, 121 N.J. 1, 15-17 (1990). Courts may consider the following
factors when making that determination:

(1) the declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion for giving the statement, (4) whether the declarant was then in custody or otherwise the target of investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated himself or sought to exculpate himself by his statement, (8) the extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing contains the entirety, or only a portion of the summary, of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures inducement or coercion for making the statement, (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability or lack of believability of the statement, and (15) the presence or absence of corroborating evidence.

[Id. at 10 (quoting State v. Gross, 216 N.J. Super. 98, 109-10 (App. Div. 1987), aff'd, 121 N.J. 1 (1990)).]

"[A] feigned lack of recollection is an inconsistency on which the admission of a witness's prior inconsistent statement may be based." State v. Brown, 138 N.J. 481, 542 (1994), overruled in part on other grounds by State v. Cooper, 151 N.J. 326, 377 (1997). When a witness claims a lack of memory of a prior inconsistent statement, if the court finds that it is "a feigned loss of memory," the statement may be admitted under Rule 803(a)(1). State v. Soto,

340 N.J. Super. 47, 66 (App. Div. 2001) (citing <u>Brown</u>, 138 N.J. at 544).  In those circumstances, "[t]he jury is free to believe the version of the events in the statement or the version presented at trial[.]"  <u>Ibid.</u> (citing <u>Brown</u>, 138 N.J. at 542).

The court's ruling on the reliability of a prior inconsistent statement is reviewed for an abuse of discretion.  <u>See</u> <u>State v. Merritt</u>, 247 N.J. Super. 425, 434 (App. Div. 1991).  Additionally, appellate courts "defer to the trial court's credibility determinations that are often influenced by observations of the character and demeanor of witnesses which cannot be transmitted by a dry record."  <u>State v. Swint</u>, 328 N.J. Super. 236, 254 (App. Div. 2000) (citing <u>State v. Locurto</u>, 157 N.J. 463, 474 (1999)).

Here, the trial judge conducted a Rule 104 hearing and made findings by considering the factors enumerated in <u>Gross</u>.  Although S.S.'s October 2, 2014 statement was provided to detectives at the police station, S.S. was never handcuffed or placed under arrest.  The detectives provided S.S. with water, gum, and lip gloss, and permitted her to take bathroom breaks.  When she gave her statement, S.S. stated under oath that it was true.  She also agreed that she spoke of her own free will and that the detectives did not coerce her, promise her anything in return for cooperating, or "put words in [her] mouth."

During the hearing, Powell testified that the detectives told S.S. she could be charged as an accomplice and they threatened to call the prosecutor and send her to county jail. The record shows, however, that defendant, and not S.S., was the focus of the investigation. There was no suggestion that S.S. murdered Hoey or was actively involved in that offense. Since defendant was her boyfriend, any incentive S.S. had to lie would be to exculpate defendant, not to inculpate him.

Moreover, the detectives interviewed S.S. on October 2, 2014 because the information they had obtained regarding defendant's phone contradicted her September 4, 2014 statement. S.S. admitted that previously she lied. S.S. then directed the detectives on the route she and defendant drove after Hoey was murdered, including the location where defendant flashed his high beams and pulled over. That route was consistent with the cell site information retrieved from defendant's phone.

Furthermore, on cross-examination, defense counsel elicited testimony from S.S. that she felt harassed and threatened by the detectives and that she told them what they wanted to hear so that she could get out of there. "Generally speaking, in-court cross-examination of a witness can be relied on to explore

and to expose most, if not all, relevant circumstances surrounding the prior inconsistent statement." Gross, 121 N.J. at 13.

Thus, in this case, the trial judge observed S.S.'s testimony, held a Gross hearing, and viewed S.S.'s recorded October 2, 2014 statement before finding that S.S. was feigning an inability to recollect her statement, and her statement was reliable. Because the trial judge's findings are supported by sufficient credible evidence in the record, we conclude the court's decision to admit S.S.'s prior statement was not a mistaken exercise of discretion.

IV.

Defendant further argues that remarks the prosecutor made in summation denied him a fair trial, and the trial judge erred by denying his motion for a mistrial. Again, we disagree.

The record shows that during defendant's summation, defense counsel argued that because the cigarette butt found outside Hoey's townhouse after the shooting did not have defendant's or Hoey's DNA, Hoey might have been killed during a close-range struggle with an unidentified assailant. In her summation, the prosecutor responded by arguing that the medical examiner's testimony showed that "it was not a struggle, it was not a close-range thing."

Defense counsel objected and asserted that the medical examiner had described close range as one inch. The prosecutor responded by stating that the medical examiner found "no stippling, soot, or muzzle marks" on Hoey's body, which indicated that he was shot from a distance of over three feet.

The trial judge immediately instructed the jury that statements by counsel in summation are not evidence, and that it was the jury's "recollection of the evidence that should guide [them] as judges of the facts." The prosecutor later characterized defense counsel's argument as one based on an "imaginary struggle."

In addition, during the trial, the State played and introduced into evidence a video from a surveillance camera that showed a car "consistent" with defendant's car driving on a road that intersects with Schmidt Lane, shortly after the shooting. During closing arguments, the prosecutor played a clip of a video showing that same car driving on the road. Defense counsel objected and argued that the prosecutor had played a video that had not been introduced into evidence.

The prosecutor asserted that she thought she was playing the video that was introduced at trial. The judge agreed with the defense that the video played during summation was taken from a different angle from the video introduced

into evidence. The judge then instructed the jury that the parties disputed whether the video shown in the summation had been admitted and shown during the trial, but that it was the jury's recollection that controlled. The judge told the jurors that if the video had not been shown during the trial, they were "not to consider it."

After the prosecutor's summation, defendant moved for a mistrial. His attorney argued that a mistrial was warranted because the prosecutor played the wrong video during her summation. He also argued that the prosecutor had denigrated the defense by stating that the defense argument regarding the shooting was based on an "imaginary struggle."

The next day, before the jury began its deliberations, defendant renewed his request for a mistrial. The prosecutor responded that her mistake was inadvertent and that the fifteen-second video clip shown during her summation did not prejudice defendant because it was short and showed "the same car coming down the same street at the same time."

The judge agreed that the prosecutor erred, but found that her actions were not "nefarious" and that her mistake was "inadvertent." The judge stated that there is "no such thing as an error free perfect trial." The judge offered to give the jury another curative instruction, which defendant initially refused, but later

approved. The judge instructed the jury that the video shown during the prosecutor's summation "has nothing to do with this case" and that they were "not to consider it because it's not part of this case[.]" The judge then denied defendant's motion for a mistrial.

Prosecutors are "expected to make vigorous and forceful" summations, and they "are afforded considerable leeway" so long as their remarks are tethered to the evidence presented and the reasonable inferences to be drawn therefrom. State v. Frost, 158 N.J. 76, 83 (1999) (citing State v. Harris, 141 N.J. 525, 559 (1995); State v. Williams, 113 N.J. 393, 447 (1988)). However, prosecutors may "not make inaccurate legal or factual assertions during a trial and . . . must confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence." State v. Smith, 167 N.J. 158, 178 (2001) (citing Frost, 158 N.J. at 86; State v. Marks, 201 N.J. Super. 514, 534 (App. Div. 1985)).

In determining whether to reverse a conviction for prosecutorial misconduct, including improper remarks during summation, an appellate court must decide whether "the prosecutor's misconduct was so egregious that it deprived the defendant of a fair trial." Frost, 158 N.J. at 83 (citing State v. Ramseur, 106 N.J. 123, 322 (1987); State v. Siciliano, 21 N.J. 249, 262 (1956)).

22

On appeal, we must consider whether the defendant objected to the remarks, "whether the remarks were withdrawn[,]" and "whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Ibid. (citing State v. Marshall, 123 N.J. 1, 153 (1991); Ramseur, 106 N.J. at 322-23; State v. G.S., 278 N.J. Super. 151, 173 (App. Div. 1994), rev'd on other grounds, 145 N.J. 460 (1996); State v. Ribalta, 277 N.J. Super. 277, 294 (App. Div. 1994)).

Furthermore, "a mistrial is an extraordinary remedy" granted "only when necessary 'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). We will only "reverse a trial court's denial of a mistrial motion" if there was "a 'clear showing' that 'the defendant suffered actual harm' or that the court otherwise 'abused its discretion.'" Ibid. (quoting State v. LaBrutto, 114 N.J. 187, 207 (1989)). Even "when inadmissible evidence erroneously comes before the jury, an appellate court should not order a new trial unless the error was 'clearly capable of producing an unjust result.'" Id. at 397-98 (quoting R. 2:10-2).

We are convinced the judge did not err by denying defendant's motion for a mistrial and the prosecutor's summation did not deny defendant of his right to a fair trial. It is undisputed that during her summation, the prosecutor played

the wrong video, but the judge found that the mistake was inadvertent. The judge also instructed the jury to disregard the video. In the absence of some evidence to the contrary, we must presume the jury followed the judge's instructions. See State v. Short, 131 N.J. 47, 65 (1993).

Moreover, the prosecutor did not denigrate the defense by stating that defendant's claim that Hoey was shot at close range was "imaginary." In making that comment, the prosecutor was responding to the defense theory. The prosecutor noted that the evidence did not support defendant's contention that Hoey had been shot at close range.

Indeed, the medical examiner testified that Hoey was shot from a distance of more than three feet because there was no gunpowder stippling, soot, or muzzle imprints on the victim's body. The prosecutor's remarks were fair comment on the evidence presented during the trial.

V.

Defendant argues that the court erred by denying his motion for a judgment of acquittal or judgment notwithstanding the verdict (JNOV). He contends that at best, the evidence showed that he was in the vicinity of the area where the crime occurred, and that he may have been involved in an activity that he did not want the police to discover.

A motion for judgment of acquittal is governed by Rule 3:18-1, and a motion for JNOV is governed by Rule 3:18-2. Trial courts apply the same standard under either rule, and must consider

> whether the evidence viewed in its entirety, and giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom, is such that a jury could properly find beyond a reasonable doubt that the defendant was guilty of the crime charged.
>
> [State v. Tindell, 417 N.J. Super. 530, 549 (App. Div. 2011) (quoting State v. D.A., 191 N.J. 158, 163 (2007)).]

We apply that standard when reviewing the trial court's decision. Ibid. (citing State v. Moffa, 42 N.J. 258, 263 (1964)).

On appeal, defendant argues that the State failed to present sufficient direct evidence linking him to the crime. However, as our Supreme Court has observed, "The inference of guilt may, of course, be based upon circumstantial evidence." State v. Franklin, 52 N.J. 386, 406 (1968) (citing State v. Fiorello, 36 N.J. 80, 86 (1961)).

Thus, the question is not whether the evidence was direct or circumstantial, but whether the evidence was sufficient, giving the State the benefit of all legitimate inferences, to find beyond a reasonable doubt that the defendant was guilty. See Fiorello, 36 N.J. at 90. We are convinced that, in this

25

case, the evidence was sufficient to sustain the jury's verdict. We therefore conclude the judge did not err by denying defendant's motions for a judgment of acquittal and JNOV.

## VI.

In his supplement pro se brief, defendant argues that the trial court improperly interfered with his right to counsel of his choice. The record does not support defendant's argument.

The Federal and State Constitutions entitle a defendant who does not require appointed counsel to choose her or his attorney. See State v. Kates, 216 N.J. 393, 395 (2014) (per curiam). That right, however, is not absolute, and must be balanced against other factors, including the court's need to control its calendar and the public's interest in the orderly administration of justice. Id. at 396-97.

Trial courts should consider the following factors in exercising their discretion in determining whether to grant a continuance for a defendant to retain private counsel:

> the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant

contributed to the circumstance which gives rise to the request for a continuance; whether the defendant has other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel; whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature; the complexity of the case; and other relevant factors which may appear in the context of any particular case.

[Id. at 396 (quoting State v. Furguson, 198 N.J. Super. 395, 402 (App. Div. 1985)).]

Trial courts "retain considerable latitude in balancing the appropriate factors." Id. at 397 (citing State v. Hayes, 205 N.J. 522, 537-39 (2011)). A trial court, however, deprives a defendant of the right to counsel of choice if it "summarily denies an adjournment to retain private counsel without considering the relevant factors, or abuses its discretion in the way it analyzes those factors[.]" Ibid.

Here, the record shows that before defendant's second trial, the trial judge, on his own initiative, said that he wanted to "get something . . . off my chest." The judge explained that prior to defendant's first trial, an attorney had contacted him and said that "based on him hanging out with [defendant] for two weeks[,] . . . he wanted to jump into the mix" and represent defendant. The judge told the attorney he had to be ready to pick a jury on the scheduled trial date if he

27

wanted to be involved in the trial. Attorneys from the Office of the Public Defender (OPD) represented defendant at his first trial.

The judge further explained that before the second trial, an attorney sent a message to the court's staff, indicating he had been contacted about substituting for defendant's counsel, but the attorney stated that he was currently handling another matter in Mercer County, and wanted to know whether the January 10, 2017, trial date was "firm." The judge informed the attorney that he could substitute into the case if he was ready to being jury selection on the scheduled trial date.

When the judge made these remarks, defendant was in court with the attorneys from the OPD who were representing him. They did not respond to the judge's comments. Moreover, defendant did not make a motion for an adjournment or for substitution of counsel. The attorneys from the OPD represented defendant at his second trial.

On appeal, defendant argues that the judge denied his request for private counsel without undertaking "the thoughtful analysis" required by Kates and Furguson. He contends the judge erred by refusing to grant an adjournment of the trial.

Defendant's arguments lack sufficient merit to warrant extended comment.  <u>R.</u> 2:11-3(e)(2).  We note, however, that defendant never made a motion for substitution of counsel, nor did he seek an adjournment of the second trial so that he could retain private counsel.  The judge was not required to undertake an analysis of the relevant factors enunciated in <u>Kates</u> and <u>Furguson</u> where no such application was made.  We therefore reject defendant's contention that the judge improperly interfered with his right to counsel of his own choice.

VII.

Defendant also challenges his sentence.  He argues that a sentence of seventy years of imprisonment, with an eighty-five-percent period of parole ineligibility, is clearly excessive and unreasonable.

"Appellate review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard."  <u>State v. Blackmon</u>, 202 N.J. 283, 297 (2010) (citing <u>State v. Jarbath</u>, 114 N.J. 394, 401 (1989)).  On appeal, we may "not substitute [our] judgment for that of the sentencing court."  <u>State v. Fuentes</u>, 217 N.J. 57, 70 (2014) (citing <u>State v. O'Donnell</u>, 117 N.J. 210, 215 (1989)).  We

> must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the

record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Here, the trial judge reviewed defendant's criminal history. The record shows that defendant has a long and extensive criminal record, which includes a conviction in 1997 of second-degree possession of a weapon for an unlawful purpose. The judge therefore found that defendant qualified for an extended term both as a persistent offender under N.J.S.A. 2C:44-3(a), and as a second-time firearm offender under N.J.S.A. 2C:44-3(d).

The judge found aggravating factor one, N.J.S.A. 2C:44-1(a)(1) (nature and circumstances of the offense). The judge noted that the offense had been "committed in an especially heinous, cruel and depraved manner." The judge also found aggravating factor three, N.J.S.A. 2C:44-1(a)(3) (risk that defendant will commit another offense). The judge pointed out that defendant had committed the offenses for which he was being sentenced not long after he was released from federal prison.

Based on defendant's criminal history, the judge found aggravating factor six, N.J.S.A. 2C:44-1(a)(6) (extent of defendant's criminal record and the seriousness of the offenses for which defendant was convicted). In addition, the

judge found aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) (need to deter defendant and others from violating the law). The judge found no mitigating factors.

The judge commented that he had intended to sentence defendant to life imprisonment, but he "took into consideration" a letter that defendant's mother had written to the court. The judge merged count two (possession of a weapon for an unlawful purpose) into count one (murder), and sentenced defendant on count one to seventy years in prison, with an eighty-five-percent period of parole ineligibility, pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. The judge also sentenced defendant to a consecutive ten-year term, with five years of parole ineligibility, for the certain persons conviction. For all other convictions, the judge imposed concurrent sentences.

On appeal, defendant argues that the judge did not sufficiently explain his reasons for finding aggravating factors three, six, and nine. We disagree. The judge provided sufficient reasons for his findings. Defendant's lengthy criminal history, which included numerous convictions for weapons offenses, along with the fact that defendant shot and killed Hoey not long after his release from federal prison, provided a sufficient basis for finding aggravating factors three, six, and nine.

31

Defendant also argues that the court "did not sufficiently explain [its] rejection of mitigating factor nine in light of defendant's lack [of a criminal] record since 2004."[3]  See N.J.S.A. 2C:44-1(b)(9) (defendant's character and attitude indicated that he was unlikely to commit another offense).  Again, we disagree.

The judge noted that the record did not support a finding that defendant had been offense free for a substantial period of time.  Defendant's lengthy criminal history, and his inability to go for more than three years without violating the law after his release from federal prison, provided a sufficient basis for the judge to reject mitigating factor nine.

We therefore conclude that the judge followed the sentencing guidelines and there is sufficient credible evidence in the record to support the judge's findings on the aggravating and mitigating factors.  We reject defendant's contention that the judge failed to adequately weigh the aggravating factors.

Furthermore, the judge provided adequate reasons for imposing the seventy-year prison term for Hoey's murder, rather than the thirty-year sentence that defendant sought.  The sentence is reasonable and does not shock the

---

[3] Defendant does not challenge the judge's refusal to find mitigating factor eight, N.J.S.A. 2C:44-1(b)(8) (defendant's conduct was the result of circumstances unlikely to recur).

judicial conscience.  See Fuentes, 217 N.J. at 70 (quoting Roth, 95 N.J. at 364-65).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4777-16T1